**SANDERSVILLE RAILROAD COM-
PANY, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. No. 2653.**

United States District Court,
M. D. Georgia,
Macon Division.

July 3, 1974.

Randolph W. Thrower, Larry J. White,
James K. Hasson, Jr., Sutherland, Asbill
& Brennan, Atlanta, Ga., for plaintiff.

Jack D. Warren, Fred W. Schwendi-
mann, Tax Div., Dep. of Justice, Wash-
ington, D. C., William J. Schloth, U. S.
Atty., Macon, Ga., for defendant.

BOOTLE, Senior District Judge:

This cause came on for trial before
the Court without a jury. At the con-
clusion of the trial, the Court invited
counsel to prepare proposed Findings of
Fact and Conclusions of Law. Counsel
have complied and the Court has care-
fully considered the proposals made.
Having those proposals in mind and
based upon all the evidence of record,
both testimonial and documentary, in-
cluding stipulations of counsel, the Court
now makes its Findings of Fact and Con-
clusions of Law as follows:

## FINDINGS OF FACT

### I. *Background*

1.

This is a civil action instituted by
Sandersville Railroad Company ("Plain-
tiff") against the United States of
America ("Defendant") for the refund
of $445,468.22 of tax, plus interest, as-
sessed and collected from Plaintiff un-
der sections 531–537 of the Internal
Revenue Code of 1954, as amended, as
tax upon the assertedly unreasonable ac-
cumulation of earnings for the calendar
years 1965, 1966, 1967, 1968, and 1969,
plus costs and interest as provided by
law. (P. Ex. 1, Stip. Par. (1)). After
suit was filed, the interest paid by
Plaintiff, together with interest thereon,
was refunded to Plaintiff pursuant to
Stipulation and Order filed November
8, 1972. Therefore, there is involved in
this case only the amount of accumulat-
ed earnings taxes paid by Plaintiff as
follows:

| | |
|---|---|
| 1965 | $ 63,189.26 |
| 1966 | $ 79,488.48 |
| 1967 | $ 79,829.49 |
| 1968 | $106,503.75 |
| 1969 | $116,457.24 |
| Total | $445,468.22 |

plus costs and interest to which Plaintiff
is entitled on any sums unlawfully as-
sessed and collected as accumulated earn-
ings taxes. The jurisdiction of this
Court is not disputed. (P. Ex. 1, Stip.

Par. (3) and (4); Pretrial Order Par. 1).

## 2.

Plaintiff is a Georgia corporation which was incorporated in 1893, and it has been continuously engaged thereafter in the business of operating a shortline railroad in Washington County, Georgia. Plaintiff is, and was at all times, a public utility subject to regulations of the Interstate Commerce Commission and the Georgia Public Service Commission. (P. Ex. 1; Stip. Par. (2); Tr. 63).

## 3.

Plaintiff was organized by a small group of interested citizens in the Sandersville, Georgia area for the purpose of providing competitive freight service in that area. At that time, the City of Sandersville was served by the Augusta Southern Railroad (later known as the Georgia & Florida Railroad) which ran from Augusta to Tennille through Sandersville, and the Sandersville residents determined that more competitive rates could be secured if a second railroad were built. Plaintiff originally built and operated a four-mile long railroad from Sandersville to Tennille which carried both freight and passengers. The primary freight items carried at that time were cotton and timber. (Tr. 63–64, 66).

## 4.

Plaintiff had only one rail connection at the time it was formed, with the Central of Georgia Railway, at Tennille, Georgia, and that same situation exists today, except that the Central of Georgia Railway has been acquired by the Southern Railway Company. (Tr. 63, 106–107).

## 5.

Mr. Ben Tarbutton, Sr. was prevailed upon by the stockholders of Plaintiff to assume control of the Plaintiff in the late 1910's. (Tr. 64). Plaintiff was in poor financial condition at the time but was needed by the community. The portion of the line of the Georgia & Florida Railroad running from Tennille to Augusta through Sandersville was abandoned in the mid-1930's. (Tr. 64–65).

## 6.

At the time Mr. Tarbutton, Sr. assumed operational control of Plaintiff, the area it served was an economically depressed agricultural community, and it remains so today. (Tr. 65–66). Under the guidance of Mr. Tarbutton, Sr., Plaintiff became a major factor in the industrial development of the Washington County area. During the 1920's, Mr. Tarbutton, Sr. first sought to interest kaolin companies in locating in Plaintiff's area of operation, and he made contact with Edward J. Grassman, president and chief executive officer of Georgia Kaolin Company, in an effort to attract the Georgia Kaolin Company to the Sandersville area. (Tr. 65–66, 67–68). Kaolin clay deposits were and are to be found in great quantities in the Washington County area. The kaolin clay is processed into the form of a fine, white powder. The primary industrial use of kaolin is in the filling and coating of high quality paper. Its other uses are many, including serving as a filler in paint and rubber. (Tr. 88–89, 407). Kaolin processing plants are major industrial installations, requiring large capital expenditures and large quantities of land for the plant itself, for railroad sidings and for effluent settlement ponds. (Tr. 68–77, 411–412; P. Ex. 2(a), 2(b), 2(c) and 2(d)).

## 7.

The first kaolin plant to locate in Sandersville began production in 1938. (Tr. 66). During the 1940's, three additional kaolin plants were constructed on Plaintiff's line. (Tr. 66–67). At this time, the kaolin clay was mined, processed and shipped by rail in box cars. The cars were loaded with processed kaolin by means of wheelbarrows and shovels from the platform on the back of the Plaintiff's offices. (Tr. 66).

### 8.

After schooling and military service, Ben J. Tarbutton, Jr. and his brother, Hugh M. Harbutton, the two sons of Ben Tarbutton, Sr., returned to Sandersville and were employed full-time by Plaintiff in 1955. (Tr. 62, 537, 1290). Ben Tarbutton, Jr. was designated a vice-president of Plaintiff at that time. (Tr. 62, 316–317, 537).

### 9.

Around 1955, Mr. Tarbutton, Sr.'s contacts with Mr. Grassman of Georgia Kaolin Company came to fruition, and Mr. Grassman committed a new corporation which was controlled by him, American Industrial Clays, to the construction of a new kaolin plant at a location approximately six miles from Sandersville. The plant was to be built at the site now known as Kaolin, Georgia, after the Plaintiff had acquired the necessary right-of-way and approval of the appropriate regulatory agencies. (Tr. 68, 79, 407–412; P. Ex. 3).

### 10.

After Plaintiff acquired approval of the Georgia Public Service Commission for construction of the track to Kaolin, Georgia, suit was brought against it to compel it to secure approval of the Interstate Commerce Commission on the grounds that this constituted a major extension of its road and not, as contended by Plaintiff, a mere spur track. (Tr. 170, 283). In Gilmore v. Sandersville Railroad Company, 149 F.Supp. 725 (M. D.Ga.1955), it was determined that this was an extension and that I.C.C. approval was required. Plaintiff then sought approval of the Interstate Commerce Commission, but encountered opposition from individual residents of the Sandersville area. (Tr. 182–185, 284; P. Ex. 10(a)).

Among the grounds for objection was the Plaintiff's alleged lack of financial capability to construct the desired track extension and the consequent jeopardy to Plaintiff from the venture. (Tr. 184–185, 284, 287; P. Ex. 10(b)). To counter this objection, Mr. Tarbutton, Sr., assured the Interstate Commerce Commission that the track extension would be constructed without resort to borrowing from financial institutions or liquidation of other assets. (Tr. 184). Mr. Tarbutton, Sr. and his sons advanced funds to Plaintiff to enable construction of the track extension to Kaolin, Georgia. (Tr. 184).

### 11.

The track extension to Kaolin, Georgia, was completed in 1957. (Tr. 68, 79, 536; P. Ex. 3). After the construction at Kaolin of the American Industrial Clay plant and a second kaolin plant by an existing customer, Plaintiff served seven kaolin plants, and kaolin was the primary commodity carried by Plaintiff and generated the greatest part of its freight revenues. (Tr. 68, 87, 95, 214).

### 12.

Mr. Tarbutton, Sr. died in September, 1962. (Tr. 61, 82–83, 1129). Ben Tarbutton, Jr. then succeeded to the presidency of the Plaintiff and Hugh Tarbutton became the vice-president. (Tr. 61, 83–85, 1258). At this time, Ben Tarbutton, Jr. was 31 years old and Hugh Tarbutton was 29 years of age. (Tr. 1285–1286).

### 13.

Following Mr. Tarbutton, Sr.'s death, and through 1969, the stock of the Plaintiff was owned as follows (P. Ex. 1, Stip. Par. 7):

| | Shares | Percentage |
|---|---|---|
| Estate of Ben J. Tarbutton, Sr. | 1,250 | 25 |
| Ben J. Tarbutton, Jr. | 1,525 | 30.5 |
| Hugh M. Tarbutton | 1,525 | 30.5 |
| Rosa M. Tarbutton | 500 | 10 |
| C. Findley Irwin | 200 | 4 |

Rosa M. Tarbutton is the widow of Mr. Tarbutton, Sr. (Tr. 1121). C. Findley Irwin, now deceased, was unrelated to the Tarbutton family. (Tr. 1128–1129).

14.

The general manager of Plaintiff, Herbert Blackman, who had been in charge of the day-to-day operations of the Plaintiff, died in March 1963. (Tr. 82–84).

II. *Operating and Financial Policies 1963 to Date*

15.

Following the death of their father, Ben and Hugh Tarbutton realized that their most important task was the convincing of their customers, banking connections, mainline connection and suppliers of their ability to continue to operate Plaintiff efficiently and prudently. They decided that this result could best be accomplished by providing the very highest quality of service and equipment to their customers and by increasing the financial strength of Plaintiff. (Tr. 251–252).

16.

Ben and Hugh Tarbutton also determined that Plaintiff would adopt a policy of growth and would seek aggressively to exploit all opportunites for growth. They believed that Plaintiff would benefit directly from growth by increased freight revenues and indirectly by a broadening of the industrial base of the Sandersville community. In order for Plaintiff to pursue a policy of growth, they believed that its financial posture had to be strengthened. (Tr. 185–186, 188, 213, 1349–1351).

17.

Consistent with their basic operating philosophy, the Tarbutton brothers adopted a conservative approach to the financing of new property and equipment. They recognized, following their father's death, that major expenditures would be required to maintain and im-

prove service to existing customers and to provide service to new customers. To the extent possible, they desired to pay cash for these new properties and equipment. When borrowing appeared necessary, they sought to make the largest down payment possible at the time and to repay the loan over the shortest possible period. Once major debt was assumed, they desired to reduce the indebtedness substantially before incurring another major liability. (Tr. 255–256, 535, 1292–1293, 1748).

18.

During the period 1965 to 1970, Plaintiff acquired the capital assets described on the attached Exhibit A to these Findings of Fact and Conclusions of Law, at the cost and terms shown thereon. (P. Ex. 1, Stip. Ex. H). The total annual amounts of those capital acquisitions were (P. Ex. 1, Stip. Ex. H):

| Year | Cost |
| --- | --- |
| 1965 | $ 1,279,488 |
| 1966 | 202,618 |
| 1967 | 316,510 |
| 1968 | 275,267 |
| 1969 | 4,310 |
| 1970 | 1,228,941 |
| Total: | $ 3,307,134 |

Of this total, $2,078,193 is attributable to the years 1965 through 1969.

19.

Consistent with the conservative financial policies adopted by Plaintiff's new management, Plaintiff has acquired capital assets for cash when possible and has utilized borrowed funds on a basis deemed least likely to jeopardize its business. For example, a new locomotive was acquired in 1964 for cash at a cost of approximately $140,000. (Tr. 137, 632; P. Ex. 14, Minutes of Directors Meeting of August 5, 1964). Roadway and roadway property acquisitions, substantial in amount, were always made by cash payments. (Tr. 1499–1500; P. Ex. 1, Stip. Ex. H). Plaintiff's policy in purchasing cars was to pay as much

as possible in cash out of its own funds and borrow the balance of the purchase price from the Citizens & Southern National Bank, repayable on an installment basis over a period of years not to exceed five or six, with the purchased cars put up as security. Plaintiff sought to accelerate its payments whenever possible so as to feel free to continue its car purchase program and meet other needs. (Tr. 535). Plaintiff purchased cars in 1961, 1965, 1970, 1972, and 1974. In 1961, the loan on the car purchase was for approximately 80 percent of the purchase price, was at the prime rate of interest, and was repaid in twenty-two months. (Tr. 1292–1293; P. Ex. 14, Minutes of Directors Meeting of July 20, 1961). In 1965, Plaintiff paid down 21 percent, or $230,050, on the purchase of the fifty aluminum hopper cars, repayable over six years. In 1970, Plaintiff paid down 52 percent on the cars; in 1972, 21 percent; and in 1974, 64 percent down. (Tr. 1772–1773). It accelerated payments on the 1972 debt. (Tr. 1752–1753). Out of a total cost of capital acquisitions of $2,078,193 in

the years 1965–1969, only $182,075 of the debt incurred to acquire those assets remained outstanding at the end of 1969, and of that amount, only $83,561 represented long-term debt not due within twelve months. (P. Ex. 1, Stip. Ex. F and H).

### III. *Plaintiff's Business Needs*

#### A. *Working Capital Requirement*

20.

The working capital of a corporation consists of its current assets available for current operating needs. It is measured by subtracting current liabilities from current assets. If current liabilities exceed current assets, this is commonly denoted as a deficit in working capital. An excess of current assets over current liabilities is often referred to in terms of a ratio as 1½ to 1, 2 to 1, *et cetera*. (Tr. 1163–1164, 1193–1194, 1222–1223). Plaintiff's actual working capital position during the years in suit, as shown on its books, was (P. Ex. 1, Stip. Ex. F; P. Ex. 29):

| | 1965 | 1966 | 1967 | 1968 | 1969 |
|---|---|---|---|---|---|
| Current Assets | $231,635.33 | $341,045.32 | $242,191.22 | $378,342.31 | $520,224.59 [1] |
| Current Liabilities | $373,615.64 | $372,372.39 | $324,246.52 | $357,150.41 | $365,570.18 |
| Net Current Assets | ($141,980.31) | ($ 31,327.07) | ($ 82,055.30) | $ 21,191.90 | $154,654.41 [1] |

21.

"Working capital needs," as the term is used for purposes of this case, represents that amount of current assets in excess of current liabilities which will permit the corporation to pay its current liabilities and operate for a period of time without dependence upon future earnings. Both parties have made a de-

termination of Plaintiff's current working capital requirements at the end of each taxable year by reference to the average operating expenses incurred for a particular period of time. The principal difference between them is over what should be the length of that period of time. Defendant supports a determination varying from approximately 21 to

1. To evaluate plaintiff's working capital position, the $170,000 reserve fund earmarked to meet the contract price on the locomotive to be delivered in 1970 is here excluded from current assets. (Tr. 139, 1073–1074, 1165–1166, 1182–1183, 1188–1190).

26 days, or from 5.98 percent to 7.19 percent of the operating expenses of the taxable year. (Tr. 1552–1554, 1563; Def. Ex. 8). Plaintiff supports a period of four months, or one-third of the operating expenses of the particular year in question. (Tr. 216, 678). A current asset to current liability ratio of 2 to 1 is frequently utilized in financial analysis as a desirable working capital position. (Tr. 1226). *See* Sterling Distributors, Inc. v. United States, 313 F.2d 803, 808 (5th Cir. 1963). Defendant's working capital allowance would result in a ratio of approximately 1.2 to 1, while Plaintiff's would have provided a ratio of between 1.5 to 1 and 1.9 to 1.

## 22.

Defendant's determination of working capital needs was stated to have been made in accordance with the so-called *Bardahl* formula. (Tr. 1544–1547, 1549–1553, 1560, 1563). Under this formula, an amount equal to the average of the accounts receivable at the beginning and end of each year is divided into the gross operating revenues for the year to determine the number of times the accounts receivable may be assumed to have "turned over" during that year. This figure is then divided into 360, representing the number of days of the year, to obtain a number of days representing an "operating cycle" or, in other words, the number of days in which on the average the accounts receivable will "turn over". By dividing this by 360, the number of days of the year, the "operating cycle" is then expressed in terms of a percentage which is then multiplied by the total expenses of the year, less depreciation, to obtain a figure representing "working capital needs" for an average "operating cycle". (Tr. 1552–1554; Def. Ex. 8).

## 23.

The largest part of Plaintiff's revenues are collected from consignees of kaolin through settlements with Plaintiff's connecting roads. (Tr. 564). However, the average length of time for the collection of accounts receivable during the year is short. (Tr. 678). Plaintiff has no inventory of goods held for sale which, for a manufacturing company, increases the numerator of the fraction used in determining the length of the operating cycle and increases the length of the operating cycle itself. As explained by the Revenue Agent called as a witness by the Defendant, the *Bardahl* formula does not take into account contingent liabilities which would not be reflected on the balance sheet as current liabilities but which, under normally accepted principles of accounting, would have to be disclosed in footnotes to any published financial statement. (Tr. 1065–1074, 1576–1577). Nor, according to the Revenue Agent, does the formula utilized by the Defendant in this case take into account unusual items of expense which might occur from time to time but are not regular and recurring items. (Tr. 1584–1586). For example, in December 1969, Plaintiff incurred unusually large road maintenance expenses of approximately $80,000, attributable to the purchase of rail for roadway replacement. (Tr. 1192; P. Ex. 35, Railway Operating Expenses Schedule, 1969). Except for unusual items of this sort, the current operating expenses of the Plaintiff were spread fairly evenly over a period of a year. Similarly, Defendant's computation gave no consideration to the fact of a constant and anticipated increase in the level of Plaintiff's expenditures, which rose from $569,314 in 1965 to $1,028,067 in 1969. (P. Ex. 29).

## 24.

In its determination of working capital needs Plaintiff undertook to take into consideration not only its normal expenditures but also contingent liabilities or potential claims including those outstanding and those which might be expected to arise from time to time in the operation of the business but which were not known at the end of the year. (Tr. 216–217, 226–229, 1450–1453.) Known contingencies of this description existing at various times dur-

ing the taxable years included: contingent personal liability and liability for damage to the equipment of the Southern Railway resulting from the wreck of the *Nancy Hanks* passenger train in December 1965; the unusual requirement for substantial repair of fifty aluminum hopper cars which arose in March 1968 and was not concluded until after ·taxable years; and Defendant's claim for tax deficiencies for the years 1965, 1966, and 1967, which arose in 1968 and culminated in payment after December 31, 1969. (Tr. 216–222, 227– 229, 678, 1450–1454). The amount of the proposed tax deficiency outstanding at the end of 1968 and 1969 was approximately $243,000. (Tr. 1072, 1073).

25.

Plaintiff in its operations faces the hazard of an interruption or restriction in its current operating income as a result of such possibilities as a strike, energy shortages, the development of environmental problems, and the existence of a national emergency such as war or a period of recession. (Tr. 1449– 1454). The Plaintiff's operations could be affected by a strike on the Southern Railway, or other roads on which Plaintiff is dependent, on the part of the kaolin plants on its line, or in major consignees of its customers. Plaintiff experienced such a strike in July 1971, when its connecting carrier, the Southern Railway, was forced to stop operation for seventeen days. (Tr. 447–448, 1265– 1269). Plaintiff had prepared for the strike and was able to continue its service to its customers for fifteen days, despite its inability to ship cars outbound beyond Tennille. (Tr. 448, 991–992, 1265–1270, 1521–1522). A professor of finance at the university level, called by the Defendant as an expert, testified that it was widely recognized that in determining standards of cash adequacy one should take into account "the risk of the firm's running out of cash, particularly in recession periods." (Tr. 1638). It is considered reasonable, moreover, in making such determinations, to take into account the maximum and most probable adverse limits of recession cash flows and balances. (Tr. 1638).

26.

Many of Plaintiff's employees, both those working within the office and those working on the road, have long experience in railroad operations and would be most costly to replace. (Tr. 1271–1276, 1392–1393, 1450–1451). These include for example: the general superintendent, with almost thirty years of railroad experience in bookkeeping, car distribution, securing of cars and freight agency supervision; the interline accounting expert, with twenty-five years of experience; the office manager, with thirty years of experience; and the auditor-comptroller, with over forty years of railroad accounting experience. (Tr. 1271– 1274). Most of these people were brought to Sandersville by the Plaintiff and replacements would not be available from within Sandersville but would have to be found from among the employees or former employees of other roads. (Tr. 1274, 1277). Moreover, the men of each train crew are experienced in working as a team. The work is hazardous to both life and property and the members of the crew bear a heavy responsibility. (Tr. 1274–1276). The rate of turnover of the members of the crew has been very low. (Tr. 1274). Employee relations have been good and the morale of the employees has been good. (Tr. 824, 1271–1277). During the periods of interrupted service or reduced income, Plaintiff's management would carry its full complement of employees for an extended period, not less than six months, before considering the release of employees. (Tr. 1276–1277, 1451–1452, 1454). Replacements would generally be costly and time consuming. (Tr. 1277).

27.

Taking into account all of the foregoing factors, the reasonable needs of the Plaintiff for working capital at the end

of each of the taxable years was equivalent to one-third of the operating expenses for the year, less depreciation, amounting to the following (P. Ex. 29):

| Year | Annual Expenses | Working Capital Needs (⅓) of Annual Expenses |
|---|---|---|
| 1965 | $ 569,313.80 | $189,771.26 |
| 1966 | $ 853,216.89 | $284,405.63 |
| 1967 | $ 799,761.04 | $266,587.01 |
| 1968 | $ 887,041.01 | $295,680.33 |
| 1969 | $1,028,086.77 | $342,695.58 |

### B.  Covered Hopper Car Needs

28.

Plaintiff's principal operations consisted of delivering empty cars to its customers each morning, picking up loaded cars later in the day and carrying them to the mainline connection at Tennille for delivery to their ultimate destination.  In addition, it carried a small amount of inbound freight.  About ninety percent of its total traffic was kaolin from the kaolin plants on its line during the years 1965 to 1969. (Tr. 214). Kaolin can be carried in dry form in bulk by box cars or by covered hopper cars, in bags by box cars, or in a liquid "slurry" form by tank cars. (Tr. 89).  The majority of Plaintiff's kaolin traffic was carried in covered hopper cars during the years in suit. (Tr. 89).

29.

The kaolin plants on Plaintiff's line were vitally concerned with freight costs, the efficiency of the cars in respect to the costs and convenience of loading and unloading, and the availability of cars. (Tr. 90–99, 982–985).  The freight cost was a substantial part, as much as one-half, of the total cost of the kaolin to the consignees of Plaintiff's kaolin shippers.  Consequently, a shipper with higher freight costs than his competition could be seriously disadvantaged. (Tr. 92–94, 449, 983).  Moreover, the type of car utilized affected the costs both of shipment and of loading and unloading.

(Tr. 91–92, 413–414, 564, 983).  Car availability was crucial to the kaolin plants on Plaintiff's line, since they had little or no storage facilities. (Tr. 89, 413).  In order to operate smoothly they needed a regular supply of empty cars for loading, and in turn, their customers had little storage capacity and were dependent upon regular deliveries. (Tr. 465, 982–994).

30.

During the later 1950's and the 1960's there was a trend in the railroad industry to design freight cars to meet specialized needs of shippers and consignees. (Tr. 90–91).  This was reflected in a strong movement to covered hopper cars for bulk commodities, replacing box cars and open gondolas, and in the design of different sizes of covered hopper cars for particular needs. (Tr. 334, 582–584).  The covered hopper car was becoming the type of car preferred by users of processed kaolin, especially paper manufacturers, since it aided in keeping impurities out of the product and it facilitated mechanical loading and unloading. (Tr. 89, 91–92, 999–1000). To service its kaolin customers Plaintiff therefore began leasing covered hopper cars and it purchased 25 covered hopper cars in 1961, when Central of Georgia decided to acquire simultaneously 75 cars of the same design. (Tr. 335, 541, 1289).  The 25 cars purchased in 1961 by Plaintiff cost approximately $332,000, weighed empty approximately

69,000 pounds, and had a capacity of approximately 3,800 cubic feet and 95 tons of kaolin. (Tr. 113, 335–336, 686–687, 1292). Through the 1960's, Plaintiff continued to make domestic shipments of kaolin in box cars, but this was primarily done where either the shipper or the recipient lacked the required facilities for loading or unloading of kaolin with a covered hopper car. (Tr. 89–92, 583–584). Shipments of bagged clay for export by ship were also made in box cars during this period. (Tr. 39, 1522).

31.

Because of the structure of freight rates imposed upon the shipment of kaolin, and because the cost of freight is a large portion of the cost of kaolin to the kaolin user, the capacity in cubic feet and tons of a covered hopper car was also of primary importance. (Tr. 983, 1428–1430). As freight rates were changed throughout the 1960's by the Interstate Commerce Commission, it became increasingly advantageous economically to ship kaolin in larger capacity covered hopper cars. (Tr. 486–487, 582, 1427–1430). The trend in covered hopper cars in the 1960's was toward securing the maximum tonnage possible in a car having a loaded weight not in excess of the maximum fixed by the Association of American Railroads, as authorized by the Interstate Commerce Commission, This maximum load limit, which includes the weight of both the car and the freight, was in 1965 and remains today 263,000 pounds. (Tr. 111, 828–830, 1300–1301). Thus, if a freight car weighed in excess of 63,000 pounds, the most economically desirable quantity of kaolin, 200,000 pounds, or one hundred tons, could not be loaded into the car, regardless of the cubic capacity. (Tr. 111, 419, 486, 1301, 1430). Initially, a fifty-ton hopper car had been utilized

for kaolin traffic. (Tr. 576, 983). Thereafter, as the tonnage capacity increased, cars with a capacity of less than one hundred tons were rendered obsolete. (Tr. 90, 92–95, 575–583, 1428–1429; P. Ex. 14, Minutes of Stockholders Meeting of December 15, 1967).

32.

The rapidly increasing preference for covered hopper cars by bulk commodity shippers produced a shortage of this type of car. Moreover, a shortage of all types of cars was increasing in the early 1960's, and was of considerable concern to the Interstate Commerce Commission during the years in suit. In December 1963, the Interstate Commerce Commission initiated an investigation, designated Ex Parte 241, to deal with the adequacy of freight car ownership and utilization. (Tr. 850; F.R.Doc. 64–70, I.C.C. Order of December 20, 1963, in Ex Parte No. 241, 29 Fed.Reg. 119 (Jan. 4, 1964) (copy attached to Plaintiff's Supplementary Listing of Documents submitted December 10, 1973). The Interstate Commerce Commission collected considerable data from the nation's significant railroads, including Plaintiff, and initially proposed a requirement that each railroad own a sufficient quantity of cars to carry all freight originating on that railroad's track. This proposal was withdrawn, at least temporarily, in the late 1960's, but the I.C.C. took an alternative approach of increasing freight and "car hire" rates to induce railroads to purchase more cars.[2] (Tr. 419, 519, 894–895; P. Ex. 24, pp. 4, 23–25, 43, 55–58). Plaintiff shared in the revenues from the freight charges with respect to all freight moved on its road, regardless of the ownership of the car in which the freight was carried. (Tr. 826–827). Also, under Interstate Commerce Commission rules in effect during the taxable years and subsequently, Plaintiff received from other roads "car

---

**2.** The car ownership rules are summarized in Florida East Coast Ry. Co. v. United States, 327 F.Supp. 1076 (M.D.Fla.1971); Allegheny-Ludlum Steel Corp. v. United States,

325 F.Supp. 352 (W.D.Pa.1971), rev'd, 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972).

hire" for the use of cars owned by Plaintiff, consisting of a fixed rate per diem for each day the car was on another road (loaded or empty) plus a rate per mile travelled on other roads (loaded or empty). Conversely, Plaintiff paid "car hire" when the cars of other roads were on its line. (Tr. 827–828, 894, 895–898, 1434–1439). The I.C.C. revised the covered hopper "car hire" rates upward to encourage car purchase. (Tr. 894–895). The Interstate Commerce Commission's policies were of great concern to Plaintiff's management and influenced their car acquisition program. (Tr. 519; P. Ex. 14, Minutes of Directors Meeting of December 10, 1966).

### 33.

Other features of covered hopper cars of importance to the Plaintiff's customers were the pattern of discharge or unloading of the kaolin from the bottom of the covered hopper cars and the angle of the discharge gates. (Tr. 91, 421). Two discharge patterns were available: the center discharge car, referred to as a "center-flow", had a row of discharge gates running along the middle of the car's bottom; while the side discharge car had two rows of discharge gates, one along either side of the car. The customers of the kaolin plants served by the Plaintiff standardized their unloading equipment to accept only the side discharge pattern. (Tr. 421, 983, 1001). Plaintiff's managers also determined that kaolin "flowed" or discharged better, without "bridging" or jamming, from a squared body design than from a rounded design. (Tr. 413–414). For the convenience and efficiency of its customers and their consignees, as well as itself, Plaintiff therefore sought in the 1960's to "standardize" its hopper cars to a side discharge, rather than a center discharge, and to a squared type body, rather than a rounded type. (Tr. 1305–1306, 1326–1327).

### 34.

During the early 1960's, these many factors of rate design, type, size, weight, cubic capacity, configuration and structural strength were causing rapid changes in the design of covered hopper cars. The rapidity of the rate of change in the design of hopper cars is illustrated by the fact that the obsolescence of cars purchased by Plaintiff in 1961 was accelerated by the development of larger but lighter aluminum cars of a type purchased by Plaintiff in 1965, which Plaintiff then considered the "car of the future" for kaolin, and the fact that the aluminum cars were soon made obsolete for Plaintiff's use by their failure to bear up under the strain of such heavy weight and their replacement by a newly developed cheaper and stronger lightweight steel hopper car. (Tr. 115, 119–120). Consequently, cars purchased by Plaintiff in 1961 and 1965, ordinarily expected to be in use twenty-five to thirty-five years, had been entirely removed from Plaintiff's service by the end of 1973. (Tr. 114–115).

### 35.

The Plaintiff's sources of covered hopper cars during the 1960's were as follows:

(a) Cars supplied by its mainline connection, the Central of Georgia Railway, which was acquired by Southern Railway in 1963. (Tr. 99–100, 106). Almost all shortline railroads in the United States rely entirely upon their connecting mainline and other mainline railroads for their supply of cars. (Tr. 101, 740–741).

(b) Cars supplied by other mainline roads. Following the Southern's acquisition of the Central of Georgia in 1963, the Southern opposed Plaintiff's prior practice of heavy reliance on these sources of cars. For one thing, their use generally was tied to "short hauls" over Southern lines and "long hauls" on the other lines. Plaintiff felt required to acquiesce in Southern's demands but urged Southern to undertake a car purchase program to replace the supply of cars customarily received

from other lines. (Tr. 107–109, 1314–1317).

(c) Leased cars. There were market sources from which, on occasion, covered hopper cars could be leased. (These "bona fide" leases are to be distinguished from arrangements to finance purchases designed in the form of leases.) Because of Plaintiff's specialized requirements, it was generally not possible for Plaintiff to lease the type of car it wanted. (Tr. 100, 360–361, 488–490, 586, 988, 1022–1023, 1317). From time to time Plaintiff did lease covered hopper cars which, though not entirely suitable, were useable in Plaintiff's service. (Tr. 532, 591).

(d) Purchased cars. Cars owned by Plaintiff, as well as cars leased by it, were in "assigned service", so that under Interstate Commerce Commission rules other roads could not use these cars but were required to return them empty to the owning railroad as soon as the shipments were delivered. (Tr. 100, 305, 833, 891–892, 1318–1320).

### 36.

In 1963, Plaintiff began to experience an increasing shortage of covered hopper cars which continued throughout the years in suit despite the increased capacity per car of the covered hopper cars used by Plaintiff. (Tr. 95–96, 117–118, 307, 984, 1337–1341; P. Ex. 14, Minutes of Directors Meetings of December 13, 1965, December 10, 1966, and December 12, 1969, Minutes of Stockholders Meetings of December 17, 1964, December 13, 1965, December 10, 1966, December 13, 1968 and December 12, 1969; P. Ex. 15 (a)–(e) and 25). It was unable to secure from its connecting line a sufficient number of cars in addition to the cars it owned and leased to supply the demands of its customers. (Tr. 95–96, 1291). Plaintiff was frequently unable to supply the number and type of car requested by its customers. (Tr. 90, 984–985, 1291, 1337–1341, 1479; P. Ex. 15(a)–(e) and 25). Plaintiff's customers were repeatedly required to accept cars less suitable than those ordered by them, which adversely affected the cost of freight as well as the cost of loading and unloading. (Tr. 90–92, 421, 483–487, 1522–1524). On numerous occasions during the taxable years, the shortage of covered hopper cars caused Plaintiff's customers to restrict production for limited periods of time. (Tr. 90, 457, 561, 1479).

### 37.

In locating their plants on Plaintiff's line and in planning their expansions, Plaintiff's customers often talked with Plaintiff's management about their concern over the car supply and their reliance on the Plaintiff to supply cars. (Tr. 96, 421–422, 462–464, 987). In the mid 1950's Plaintiff's largest customer, in negotiating the location of its plant at Kaolin, Georgia, had secured an agreement from Ben Tarbutton, Sr. that the Plaintiff would seek to own and control enough hopper cars to be independent of other lines. (Tr. 102, 408, 414–416). The assurance that Plaintiff would buy and control its own cars was given by Ben Tarbutton, Jr. and Hugh Tarbutton to Plaintiff's kaolin customers repeatedly after their father's death and during the taxable years. (Tr. 97–98, 414–418, 473–474, 987, 1008, 1009). For example, in 1963, American Industrial Clays was planning a major plant expansion, but its president, Mr. Grassman, wrote to Plaintiff that the plant expansion would not be undertaken, and that a plant would be built elsewhere, unless Plaintiff could assure Mr. Grassman that the needed cars would be made available. (Tr. 96, 308–310; P. Ex. 16). Plaintiff gave this assurance and it was relied upon by Mr. Grassman. (Tr. 96–97). Plaintiff's customers preferred Plaintiff to own its own cars, rather than rely upon connecting railroads to supply its needs. (Tr. 416, 988–989, 1011–1013).

### 38.

In June 1963, the Southern Railway acquired control of the Central of Georgia

Railway. (Tr. 106). As a result of this change in control, many employees of the Central of Georgia were discharged and many operating changes were made which affected the movement of freight originating on the Plaintiff's road. Plaintiff's managers were greatly concerned over the potentially adverse effects of this change of control upon the Plaintiff's operations and upon the supply of covered hopper cars to Plaintiff by Southern Railway. Plaintiff's managers began intensive efforts to build relationships with operating personnel of the Southern Railway and to acquaint these individuals with the importance of kaolin traffic to the Southern Railway. (Tr. 106–111, 1313–1320; P. Ex. 14, Minutes of Directors Meeting of December 4, 1963).

39.

After the death of Mr. Ben Tarbutton, Sr., Mr. William E. Dillard, president of the Central of Georgia from 1954 to 1968 and an outstanding railroad man of long and diverse experience, had strongly advised Ben and Hugh Tarbutton that they should make every effort to become independent in their supply of cars. (Tr. 104–106, 720–721, 742, 1291–1292). He pointed out that the general needs for specialized equipment were increasing rapidly and the mainline roads would have increasing difficulty in meeting their own needs. He advised that Plaintiff could not safely rely on other roads for its cars. (Tr. 103–105, 743). Mr. Dillard remained as president of the Central of Georgia after the acquisition of the Central of Georgia by the Southern Railway. He again pointed out to Ben and Hugh Tarbutton that in times of shortage a mainline connection would naturally tend to respond more fully to the needs of the kaolin plants served directly by it, with which its employees had direct relations, rather than the plants located on the Plaintiff's line with which Southern's contacts were indirect. (Tr. 105–106, 744–745, 764). This concern was also expressed very pointedly to Plaintiff by its customers in support of their insistence that Plaintiff adopt a program to obtain self sufficiency in hopper cars. (Tr. 416, 742–746, 988–989).

40.

At a special meeting of the Board of Directors on May 1, 1963, at a time when the acquisition by Southern Railway was anticipated, Ben and Hugh Tarbutton secured approval of a program to move toward self sufficiency in hopper cars by purchase and by leasing. (Tr. 1293–1294; P. Ex. 14, Minutes of Directors Meeting of May 1, 1963). They anticipated that the Interstate Commerce Commission would approve charges for "car hire" which would make the ownership of cars increasingly more profitable. They also believed that, with experience in the utilization of cars, they could improve their efficiency and make the ownership of cars increasingly profitable for the Plaintiff. (Tr. 1291).

41.

The long range goal of Plaintiff was to own substantially all of the hopper cars regularly required on its line. (Tr. 1294, 1412). This was necessarily a long-range goal because of the cost of cars and the financial limitations of the Plaintiff. (Tr. 1295). Plaintiff experienced an average "turn-around" time for its hopper cars of twenty-five days, meaning that on the average twenty-five days elapsed between sending a loaded car from Sandersville until its return empty. Thus, each one hundred cars would supply an average of four cars per day. (Tr. 101). During the years in suit, Plaintiff's managers anticipated a cost of $18,500 per car. (Tr. 111). At the end of 1965, the total number of hopper cars required to provide self sufficiency was around 500 to 550 and at the end of 1969 around 600 to 650, or a total investment in cars during all five years in suit of around $10,000,000 to $12,000,000. (Tr. 1295, 1524). At the end of 1973, Plaintiff's management considered that the number of cars required to attain its goal

of self sufficiency had increased beyond 650 cars. (Tr. 1524).

### 42.

The covered hopper cars purchased by Plaintiff in 1961 had been manufactured by the Pullman-Standard Division of Pullman, Incorporated. (Tr. 335). In 1964, Plaintiff sought to buy from Pullman-Standard steel covered hopper cars of 100 ton, 4,000 cubic feet capacity. (Tr. 337, 1300; P. Ex. 14, Minutes of Directors Meeting of July 10, 1964 and August 5, 1964). No steel car had been developed at that time which was deemed structurally sound to carry 200,000 pounds (100 tons) of kaolin and which would weigh empty 63,000 pounds or less. (Tr. 359, 1300–1301). Consequently, in 1964 Plaintiff contracted to buy from another source, Magor Car Corporation, 50 aluminum hopper cars meeting these specifications. The aluminum cars cost $22,000 each, approximately $6,000 more than the steel car was expected to cost. (P. Ex. 14, Minutes of Directors Meeting of September 11, 1964 and Stockholders Meeting of December 17, 1964). The aluminum hopper car was a new design and Plaintiff was one of the first lines in the country to buy the car. (Tr. 1301). The Southern Railway had encountered some structural problems on an earlier purchase of aluminum cars from Magor but Plaintiff felt assured that its cars were strengthened so as to overcome the deficiencies found by Southern. (Tr. 119–120, 1301–1303). These cars were delivered in May 1965. (P. Ex. 14, Minutes of Stockholders Meeting of December 13, 1965). Because of the additional cost and untested design, Plaintiff's officers had decided to purchase only 50 cars initially. (Tr. 111, 116–117).

### 43.

One of the major categories of Plaintiff's capital expenditures since 1963 has been freight cars, specifically, covered hopper cars designed for carrying processed kaolin. (P. Ex. 1, Stip. Ex. H; Tr. 91). In 1965, Plaintiff purchased 50 aluminum hopper cars at a cost of $1,092,965, borrowing $862,915 to be repaid in six years at $150,000 per year. (P. Ex. 1, Stip. Ex. H; Tr. 114–117, 1297). In 1970, Plaintiff purchased 50 steel covered hopper cars at a cost of $922,038, borrowing $450,000 to be repaid in five years at $90,000 per year. (P. Ex. 1, Stip. Ex. H; Tr. 1297). In 1971, Plaintiff contracted to purchase 100 steel covered hopper cars for delivery in mid-1972, at a cost of $1,900,000, borrowing $1,500,000. (Tr. 135, 1297, 1750, 1752–1753, 1772). In 1973, Plaintiff contracted to purchase 100 steel covered hopper cars, for delivery in January, 1974, at a cost of approximately $1,960,000, borrowing approximately $660,000. (Tr. 135, 1298, 1749, 1753).

### Car Needs at the End of 1965, 1966 and 1967

### 44.

Plaintiff was advised by its customers of their planned expansions, and Plaintiff's managers anticipated increased tonnage production by existing customers in each of the years in suit. (Tr. 395, 417–418). Plaintiff's kaolin customers made substantial expansions in their plants "coming on stream" in 1965 and 1966. (Tr. 118). In 1965, Plaintiff received on a confidential basis from a representative of Southern Railway the estimate that the covered hopper car needs of Plaintiff's kaolin customers would increase from the equivalent of 513 cars of 100 ton capacity per month in 1964 to the following (Tr. 1332–1337; P. Ex. 34 (the last five customers listed)):

| Year | Monthly Car Requirements |
|---|---|
| 1966 | 738 |
| 1967 | 754 |
| 1968 | 774 |
| 1969 | 814 |
| 1970 | 863 |

The output of American Industrial Clays increased five times from 1957 to 1968.

(Tr. 412). The output of Anglo-American Clays doubled from 1965 to 1970. (Tr. 986, 1006–1007, 1031). Similar expansions occurred for Plaintiff's other kaolin shippers, and Plaintiff's transport of kaolin increased correspondingly. The total tons of freight carried by Plaintiff, of which kaolin was approximately 90 percent, increased from 808,197 in 1965 to 1,255,905 in 1969. (P. Ex. 30(a)). Cars of all types used for kaolin transport numbered 11,747 in 1965 and 15,782 in 1969, while the Plaintiff's usage of covered hopper cars for kaolin transport increased from 6,253 cars in 1965 to 7,-695 cars in 1969. (Tr. 96; P. Ex. 25 and 30(a)). The average tonnage of the covered hopper cars was known to be increasing during this period. (Tr. 111).

### 45.

At the end of 1965, Plaintiff's management knew that Pullman-Standard, which had lost substantial orders to Magor, was striving to design a lightweight steel car which would have a light weight of not more than 63,000 pounds and could carry 100 tons without exceeding the maximum allowable weight of 263,000 pounds. (Tr. 130–132, 338). The aluminum covered hopper cars had not yet proven their reliability to Plaintiff's managers and customers, and Plaintiff's management believed that in the near future Pullman-Standard would have a competitive car at much less cost. (Tr. 338, 417, 468–470, 717–718, 1303–1304). Plaintiff's managers had decided to purchase all future cars from Pullman-Standard, assuming that Pullman-Standard developed, as expected, a lightweight steel hopper car. (Tr. 1303–1305). At the end of 1965, Plaintiff's management also believed that its liabilities, known and contingent, should be reduced before substantial commitments were made for additional cars. (Tr. 597, 600, P. Ex. 14, Minutes of Directors Meeting of December 13, 1965). The Nancy Hanks wreck had occurred on December 26, 1965, and Plaintiff's management feared that the damages to the crew and passengers of the Nancy Hanks,

and to the Southern Railway locomotive and cars could be as high as $1,000,000. (Tr. 600). At the end of 1965, Plaintiff also had other immediate needs which it took into account in appraising its financial position, including the unpaid balance of $524,514 on the 1965 car purchase and the need for a new locomotive and track improvements. (Tr. 600; P. Ex. 1, Stip. Ex. F; P. Ex. 14; Minutes of Directors meeting, December 13, 1965).

### 46.

Although facing large debt and uncertainty over the Nancy Hanks claims, at the end of 1965 Ben and Hugh Tarbutton intended to make an additional purchase of 100 cars, of 100 ton, 4,000 cubic foot capacity ("c. f. c."), as soon as it became financially prudent to do so. (P. Ex. 14, Minutes of Stockholders Meeting of December 13, 1965). This was viewed as the next step in the long range program of self sufficiency in cars. A prime factor which caused a delay in placing an order for additional cars was the need to await Pullman-Standard's development and testing of a cheaper but stronger lightweight steel car to replace the aluminum covered hopper car. (Tr. 512–513, 518–519). Plaintiff had a reasonable and reasonably anticipated need for a minimum of 100 additional cars at the end of 1965, at an estimated cost of $18,-500 per car. (Tr. 118, 717, 1303).

### 47.

At the end of 1966, Plaintiff's management was aware that the Southern Railway had placed an order for a new type lightweight steel covered hopper car of 100 ton, 4,000 c. f. c. with Pullman-Standard. (Tr. 1304). Although plaintiff's officers had decided that Plaintiff would acquire all of its cars in the future from Pullman-Standard because of that company's reliability, they had no question but that they should see the new Pullman-Standard steel car in operation before ordering it. (Tr. 1304–1305, 1526–1527). Because Plaintiff was a small

railroad and had only a single use for the cars, they felt they could not make such a large financial commitment on equipment they had not seen in operation. (Tr. 524, 531).

### 48.

At the end of 1966, Plaintiff needed and intended to buy 100 additional cars as soon as it became financially prudent to do so and a steel car of the desired type had proven itself reliable in actual use. (Tr. 118). Plaintiff's managers anticipated this would be in the near future. Plaintiff had a reasonable and reasonably anticipated need for a minimum of 100 additional cars at the end of 1966.

### 49.

Plaintiff had experienced severe covered hopper car shortages in 1965, 1966 and 1967, and Plaintiff sought to alleviate this problem by the temporary expedient of leasing cars until its needs could be met through its purchase program. (Tr. 532, 591). At the end of 1967, Plaintiff had 109 cars leased to it under .long-term contracts, none of which was of the desired 100 ton, 4,000 c. f. c., side discharge design. (P. Ex. 14, Minutes of Directors Meeting of December 10, 1966 and Stockholders Meeting of December 10, 1966; P. Ex. 33). Because of the unsuitability of these leased cars, Plaintiff's customers were not satisfied and they continued to press Plaintiff to carry on its purchase program; moreover, Plaintiff earned no "car hire" with leased cars as it did with owned cars, so it was financially motivated to purchase additional cars. (Tr. 400–401, 419–420, 475, 772–773, 988, 1329–1330).

### 50.

The new lightweight steel covered hopper cars of 100 ton and 4,000 c. f. c., purchased by Southern from Pullman-Standard first began coming into use on Plaintiff's line in the latter part of 1967.

After observing these cars in use for several months, Ben and Hugh Tarbutton concluded that this car, rather than the aluminum car of Magor, was its "car of the future" for its kaolin customers. This conclusion was reached by early 1968. At the end of 1967, Plaintiff's management felt that its immediate needs were for 100 cars, and this was a reasonable and reasonably anticipated need of its business. (Tr. 118, 1307, 1475–1478, 1496).

### Car Needs at the End of 1968 and 1969

### 51.

In March 1968, the attention of Ben and Hugh Tarbutton became absorbed by the discovery that their fifty aluminum cars were not standing up under the heavy loads of kaolin but were showing serious signs of undue stress. (Tr. 533, 1481). This first came to their attention with the report of the collapse of one of their loaded aluminum cars in Texas. (Tr. 115, 119–20). An immediate inspection disclosed weaknesses in other cars. (Tr. 119–121; P. Ex. 4(a) through 4(h)). Approximately 12–15 of the aluminum cars were removed from service and, to avoid other breakdowns which might cause other roads to reject their aluminum cars altogether, Plaintiff began "light loading" the remaining aluminum cars at seventy tons, at the expense and inconvenience of Plaintiff and its customers. (Tr. 123, 126, 1528–1529). It pressed Magor Car Corporation and Fruehauf, Inc., which had acquired Magor, ·to assume responsibility for the cars. (Tr. 314). This Magor refused to do. (Tr. 115, 120–129, 310–311; P. Ex. 17). Plaintiff sued to recover approximately $100,000, the initially estimated cost of repair which eventually was settled with Plaintiff bearing a repair cost of around $94,000 and Freuhauf the balance. (Tr. 120, 127–128, 589). The repairs were completed in 1970. (Tr. 127). In 1968 and 1969, Ben

and Hugh Tarbutton felt that their entire investment of $1,100,000 in the aluminum cars was threatened and they gave priority to reducing this risk and resolving their claims against Magor. (Tr. 128, 533–534, 1528–1529, P. Ex. 14, Minutes of Directors Meetings of December 13, 1968 and December 12, 1969). They did not have confidence in the cars even after repair and had disposed of them before the trial of this case. (Tr. 128, 132). Magor and its successor, Fruehauf, have gone out of the business of manufacturing railroad cars and an aluminum covered hopper car is no longer being made. (Tr. 334–335, 1527).

### 52.

In 1968, Plaintiff's management contacted a sales representative of Pullman-Standard in the hope of locating a larger order for 100 ton and 4,000 c. f. c. lightweight steel covered hopper cars to which it could "tack". (Tr. 718, 1307, 1481, 1483). Plaintiff desired to "tack", or add, its order for cars to an order placed by another party for a larger number of cars because it could thereby secure a lower per unit cost, a more prompt delivery schedule, and the benefit of the engineering done for the larger order. (Tr. 133, 338–339, 348, 1308, 1468, 1485). Near the end of 1968, they were advised by the Pullman-Standard representative that he had a good prospect in the offing. (Tr. 1307, 1483). When this did not materialize during the course of the next six months, Plaintiff's management decided that it could wait no longer for an opportunity to "tack" its order to a larger one and Pullman-Standard was asked for quotes on 50 and 100 such cars. (Tr. 131–132, 1309, 1483). In August 1969, it gave to Plaintiff a detailed quote on 50 cars at $17,485 per car and 100 cars at $16,350 per car. (P. Ex. 18(c)). Plaintiff's management then consulted with the president of the Citizens & Southern National Bank about a loan to cover not more than eighty percent of the purchase price of 100 cars. (Tr. 132–133, 1310, 1464–1465, 1482–1483). The Bank officer referred to the serious credit shortage of that time and asked if the cars could be leased. He was advised that this was not possible. He then stated that he would prefer that they wait for a few months, when he expected some relief in the national shortage of funds, but that he would make the loan if Plaintiff's managers felt they could not wait until the money market improved. Plaintiff's management decided to delay the purchase and not press for a bank loan at that time. (Tr. 133–134, 528, 1310–1311, 1464–1465, 1483, 1514).

### 53.

Near the end of 1969, Plaintiff's management was advised by Pullman-Standard that it had received a large order for covered hopper cars of Plaintiff's type and design to which Plaintiff could tack an order. They replied that they wished to take advantage of this opportunity to tack. At the end of 1969, Plaintiff's managers intended to tack 100 cars to the order. (Tr. 132, 1464–1465, 1482). However, in early 1970, Plaintiff was advised by Pullman-Standard that the order to which it was planning to tack had been cancelled. The cancellation was attributed to financial reasons. (Tr. 344, 718–719, 1311). In May 1970, finding no order on which to tack, and faced with a continuation of the national money shortage, Plaintiff's management decided nevertheless, to proceed with a purchase from Pullman-Standard of 50 lightweight steel cars with 100 ton, 4,000 c. f. c. and of a side discharge, square body type. (Tr. 134, 335, 1484).

### 54.

Pursuant to its car acquisition program existing during the years in suit, the 100 covered hopper cars ordered by Plaintiff from Pullman-Standard in 1971 and again in 1973 were lightweight steel of the side discharge, square body type, 100 ton, 4,000 c. f. c., with per car empty weights of less than 63,000 pounds. (Tr. 135, 335–336, 339, 1297–1299).

**55.**

The "car hire" earned by Plaintiff on its fleet of owned hopper cars has become a significant revenue source to Plaintiff. Gross receipts rose to $153,658 in 1968, but declined to $119,618 in 1969 due to the removal from service of Plaintiff's aluminum hopper cars. (P. Ex. 1, Stip. Ex. G). Subsequently, gross car hire receipts have risen to approximately $500,000. (Tr. 1330).

**56.**

At the end of 1968 and 1969, Plaintiff's management intended to buy 200 additional cars as soon as they reasonably could do so. (Tr. 118–119, 135). They felt that this could be accomplished in the near future. They took steps to place a specific order for 100 cars in the summer and early fall of 1969 but were deterred by circumstances beyond their control, including a nationwide shortage in lendable funds. (Tr. 1464, 1482–1483). At the end of 1968 and 1969, their immediate needs were for not less than 200 additional hopper cars, at a minimum cost of $18,500 per car.

**57.**

Following the end of 1969 and by January 1974, Plaintiff had actually purchased 250 covered hopper cars, all of the desired design and by the preferred manufacturer, at a total cost of approximately $4,782,038.

**58.**

To recap, Plaintiff's reasonable needs for the purchase of covered hopper cars at the end of each of the taxable years, which it recognized and intended to satisfy, were as follows:

| Year | Number of Cars Needed | Estimated Cost |
|------|------------------------|----------------|
| 1965 | 100 | $1,850,000 |
| 1966 | 100 | $1,850,000 |
| 1967 | 100 | $1,850,000 |
| 1968 | 200 | $3,700,000 |
| 1969 | 200 | $3,700,000 |

**C.  *Locomotives***

**59.**

An essential piece of equipment for a railroad is a locomotive. Prior to 1964, Plaintiff owned only one locomotive. (Tr. 136). This locomotive had been purchased in 1953 and its obsolescence was accelerated in 1959 when the manufacturer ceased producing locomotives. (Tr. 136).

**60.**

Plaintiff acquired a new locomotive in each of the years 1964, 1968, and 1970. (Tr. 137, 534; P. Ex. 1, Stip.Ex.H). Plaintiff paid cash for the 1964 locomotive, but financed the 1968 locomotive one hundred percent because of other financial needs. (Tr. 137, 535).

**61.**

In 1965, 1966, and 1967, Plaintiff needed an additional new locomotive, but deferred purchasing one until a satisfactory new unit was developed by the desired manufacturer. (Tr. 137). Its managers recommended the purchase in 1966 and estimated the cost of this additional locomotive at approximately $150,000. (P. Ex. 14, Minutes of Directors Meeting of December 10, 1966 and Shareholders Meeting of December 10, 1966). The purchase was authorized by the directors in December 1966. (P. Ex. 14, Minutes

of Directors Meeting of December 10, 1966). Plaintiff ordered a new locomotive in 1967 after the desired design improvements were made, which it received in 1968 and which cost $157,825. (Tr. 137; P. Ex. 1, Stip. Ex. H).

62.

In 1968 and 1969, Plaintiff needed a third new locomotive to serve its new and expanding customers. (Tr. 137–138; P. Ex. 14, Minutes of Directors Meeting of December 13, 1968 and December 12, 1969). It ordered a third locomotive in 1969 and received it in 1970. (Tr. 138). Plaintiff anticipated paying cash for this third locomotive and it accumulated the estimated purchase price, $170,000, in a special bank account. (Tr. 139; P.Ex. 14, Minutes of Stockholders Meeting of December 12, 1969). This special reserve fund was identified on the books and financial statements of the Plaintiff. (P.Ex. 35, General Balance Sheet, December 31, 1969, Acct. No. 703). However, other financial needs in 1970 caused Plaintiff to finance the purchase. (Tr. 139). Plaintiff paid $171,948 for this third locomotive. (Tr. 139; P. Ex. 1, Stip. Ex. H).

D. *Roadway and Roadway Equipment*

63.

In order to run its cars and locomotives, Plaintiff obviously needed to maintain the condition of its existing railway. To serve new customers and to construct switching yards, Plaintiff had to have land, ballast, ties and rail. During the decade from 1961 through 1971, Plaintiff added approximately six miles of sidings and yard tracks to its road, much of it in accordance with the recommendations of an independent engineering study in 1966. (Tr. 140–141, 143, 212–213, 254; P. Ex. 14, Minutes of Directors Meeting of December 10, 1966). Plaintiff also sought, during the years in suit, to improve its existing railway trackage to facilitate the carrying of hopper cars of increasing laden weight. (Tr.

140–141; P. Ex. 14, Minutes of Directors Meeting of December 13, 1965, December 10, 1966, Stockholders Meeting of December 13, 1965, December 15, 1967). In order to accomplish these functions, Plaintiff had recognized and reasonable needs for roadway and roadway equipment during each of the suit years. As an approximation of needs known at the end of each year, Plaintiff's management took the predictable expenditures which were actually made in the immediately succeeding year (except that a two-year estimate was used at the end of 1968 because financial pressures and other facts caused a delay during 1969). (Tr. 139–143, 1345, 1499–1500). The major items needed, planned for and acquired during the period 1965–1970 were land and spur tracks, yard tracks and railway maintenance equipment such as the $55,-500 tamper and the $11,500 tractor acquired in 1970. (Tr. 140–143; P.Ex. 1, Stip. Ex. H; P. Ex. 14, Minutes of Directors Meetings of December 13, 1965, December 10, 1966, December 15, 1967 and Stockholders Meetings of December 10, 1966, December 15, 1967, December 13, 1968 and December 12, 1969). Plaintiff's reasonable and reasonably anticipated needs for roadway and roadway equipment were as follows:

| | |
|---|---|
| 1965 | $ 21,202 |
| 1966 | $ 26,251 |
| 1967 | $ 45,206 |
| 1968 | $128,142 |
| 1969 | $128,142 |

E. *Industrial Development Needs*

64.

During the taxable years Plaintiff's management actively sought to increase the number of industrial customers on its line. It was anticipated that this would increase the volume of its business, enlarge its profits and contribute employment and financial strength to the community. Special emphasis was placed on securing diversification among its customers. This policy was recognized

by the Board of Directors in the meeting of December 13, 1965. (P. Ex. 14, Minutes of December 13, 1965, Annual Meeting of Directors). Plaintiff's managers felt that it would be in the interest of the railroad and of the community to bring in new industry not controlled by the same market and operating considerations as the kaolin plants which constituted ninety percent of Plaintiff's business and a large part of the total business of the community. (Tr. 213, 252–254, 1349–1350, 1682–1683). To accomplish diversification, and increased freight volume, Plaintiff's managers worked actively with the principal industrial development offices in Georgia, such as the C&S Bank, the Industrial Development Department of the Georgia Power Company, the Georgia Chamber of Commerce and the Georgia Department of Industry and Trade. (Tr. 185–186, 215, 794, 1259 1260). The Tarbutton brothers were instrumental in the formation of the Washington County Industrial Development Committee in 1964 or 1965 and have since been constantly active in its affairs. (Tr. 62–63, 1260).

### 65.

To be able to attract new business, Plaintiff had to compete with mainline railroads and communities in Georgia, and often throughout the Southeast, which were aggressively seeking to attract the new business to their community. Many of these communities were able to offer substantial financial inducements through industrial development bonds or other means. Plaintiff also suffered the disadvantage of being a shortline railroad and was especially handicapped by the record of poor performance and financial instability generally associated with shortline railroads. (Tr. 187–188, 748, 794–795).

### 66.

Plaintiff's managers sought to overcome its handicaps in attracting new industry in several ways, first, by pointing to its own record of outstanding performance in serving the needs of its customers. (Tr. 188). They encouraged industrial prospects to talk with the managers of industries on their line. Secondly, either directly or through the representations of the various industrial development offices of the State, they let industrial prospects know that they, both as individuals and as officers of the Plaintiff, would render very valuable assistance to any new industry locating on the railroad. (Tr. 794–795). Plaintiff's managers recognized that major new industrial customers would require large expenditures by Plaintiff for track and rolling stock and Plaintiff held itself out as able to provide these facilities. (Tr. 188, 205–206, 215–216). Plaintiff customarily laid tracks into plant sites or expanded tracks without charge to the customer. (Ownership of the tracks was retained by Plaintiff.) Additionally, the Tarbutton family and family-controlled corporations owned unimproved land on or near the railroad which was held for use as needed by industrial customers locating on the road or expanding an existing location. (Tr. 989). This land was customarily made available to new customers or to expanding plants at a modest charge or without cost. (Tr. 989, 1350–1351).

### 67.

Also the Plaintiff's managers sought to emphasize, more often through the industrial development offices rather than directly, the financial strength and stability of the railroad and their commitment to the long term operation of the road. Customarily, they did not furnish financial statements to potential customers but advised them that they were a matter of public record on file with the Interstate Commerce Commission. The factor of Plaintiff's financial strength was also utilized by industrial development offices in supporting Plaintiff's efforts. (Tr. 795–798). Plaintiff's managers reasonably felt that the maintenance of a strong financial statement was an important feature of the effort

to attract new industry to their line. (Tr. 692–693; P. Ex. 14, Minutes of December 10, 1966 Annual Meeting of Directors).

68.

Plaintiff's managers devoted substantial time and effort during each of the taxable years in seeking new industry for the Sandersville area. (Tr. 794). As Plaintiff's managers anticipated, many contacts were not productive in view of the many competing lines and communities. Plaintiff was successful in locating several new industries along its line during the taxable years, the largest of which, Lapp Industries, was expected to employ about 125 people. Lapp Industries committed itself to a Sandersville plant in 1966 and it began production in 1968. (Tr. 212; P. Ex. 14, Minutes of Directors Meetings of December 1, 1966 and December 15, 1967). Another prospect came to fruition in 1968 when Evans Adhesives began production in its new Sandersville plant on Plaintiff's line. (Tr. 212; P. Ex. 14, Minutes of Directors Meeting of December 15, 1967). Plaintiff's managers also assisted in locating new industry in the area which did not require rail service. (Tr. 385, 550). However, Plaintiff was in competition for much larger industries than those which did move to Sandersville in the suit years, and Plaintiff let it be known through the industrial development offices that it was prepared to make whatever investment was reasonably required for spurs and sidings, or longer track extensions to a major plant desiring more space and isolation, and any required new equipment for such a customer. (Tr. 796–798). Plaintiff's managers were reasonable in competing for this kind of business and consequently were justified in maintaining the financial strength and stability to attract such business and meet its needs.

69.

Evidence was presented *in camera* on three specific proposals under consideration during the taxable years for major extensions of Plaintiff's rail line. The two most immediate of these proposals involved extensions of four to six miles in one instance and eight to ten miles in the other. In each of these two instances, a kaolin company was talking seriously of locating a new plant in Washington County and secured the assistance of Plaintiff's managers in locating a suitable site for the new plants. One prospect began consideration of a new plant in Washington County in 1964 or 1965, and it selected a definite plant site on land belonging to the Tarbutton brothers which would have required an eight to ten mile extension of the Plaintiff's line. (Tr. 189–196, 199–202, 424, 426, 495, 1355). This prospect planned to move slurry clay by pipeline to this new plant site and had acquired pipeline rights-of-way for this purpose. (Tr. 202, 426, 429, 1508). By 1969, it had also arranged the financing for the new plant construction and had decided upon the design for the multi-million dollar plant. (Tr. 429, 495). The other prospect first contacted Plaintiff's officers about construction of a track extension in 1965, and two specific alternate sites for its plant were still under consideration at the close of the taxable years, one requiring a four-mile extension to a site on land owned by Ben Tarbutton, Jr. and the second requiring a six-mile extension to a site owned by the prospect and nearer its kaolin deposits. (Tr. 192–197, 438, 439, 623–628, 1353–1354; P. Ex. 11). Plaintiff's managers worked closely with each of these two companies, and they assured each of their desire and ability to extend the line to the new plant and committed the Plaintiff to provide such new sidings and other equipment as would be needed. (Tr. 196–198, 201, 206, 428–429, 439, 501, 597, 624–628, 1354–1356). Taking into account the nature of the terrain, Plaintiff's managers estimated that the cost of constructing the new extensions during the taxable years would have been approximately $150,000 per mile. (Tr. 197, 201, 623–624, 1355, 1511). At the close of

the taxable years, Plaintiff's managers considered both of these proposals to be "red hot" prospects. (Tr. 197–198, 203, 429–430, 626, 1352, 1355, 1506–1509).

70.

Although other circumstances have delayed the construction of these two kaolin plants subsequent to the taxable years, neither proposal has been abandoned. (Tr. 198, 204, 496–497). As to at least one of the plants (the one requiring the longer extension), there still remains the probability that it will be constructed on the site selected. (Tr. 430–431, 1356).

71.

During the taxable years Plaintiff had under consideration other possibilities for significant and costly extensions of its lines which were of a longer range nature than the two specific proposals summarized above. In the early 1960's, several of the major aluminum producers of the nation, such as the Anaconda Company and U. S. Borax, began an active exploration into the feasibility of producing alumina from kaolin. (Tr. 206–207, 210, 630, 799–803, 1356–1357). Kaolin clay yields a high percentage of alumina, second only to bauxite. Moreover, the alumina is of a high degree of purity. Extensive deposits of a type of kaolin clay not suitable for high quality kaolin extraction but containing good quality alumina were located in the Sandersville area, and major aluminum producers acquired mineral properties in expectation of extracting alumina at those locations. Plaintiff's managers were contacted by representatives of the aluminum companies making these studies and worked closely with them. (Tr. 203–204, 206–208, 431–437, 629–630,

1357–1358, 1509–1510). The industrial development agencies in Georgia also took an active part in stimulating interest in testing the processing of alumina in the area. (Tr. 211, 799–803). Plaintiff's managers followed these developments very closely because they felt that the successful development of alumina processing at sites accessible by extension of Plaintiff's road could greatly increase Plaintiff's volume of business and add a great deal to the industry of Washington County. (Tr. 205–206, 211–212).

72.

The third specific proposal for Plaintiff's track extensions presented *in camera* dealt with an alumina processing facility. Plaintiff's managers began talking specifically with the representatives of one company in 1967 or 1968 about construction of an alumina processing facility at a location which would have required an extension three to four miles beyond the farthermost of the two potential new kaolin plants which were also under consideration at that time. (Tr. 203–205, 432, 433, 1357–1359). The location would have been near deposits of the alumina type clay which the company had secured with this use in mind. Plaintiff's managers agreed with this company that Plaintiff would construct the rail extension necessary to provide rail transportation to this proposed alumina plant. (Tr. 433–434, 629–630, 1359). Efforts were made during the taxable years to secure a liberalization of the federal income tax laws to stimulate the processing of alumina from kaolin. (Tr. 801–803, 805–806). These were partially successful.[3] The construction of the alumina processing plant by this third prospect was still a "very real possibility" at the end of 1969 and at

[3] Foreign Investors Tax Act of 1966, § 207, Pub.L. No. 89–809, 80 Stat. 1539, amended section 613 of the Code to increase from 15% to 23% the depletion allowance relating to clay deposits from which alumina or aluminum compounds are extracted. The House proposal to treat all processes applied to derive alumina from clay as "mining", and hence eligible for the benefits of the depletion allowance, failed to pass the Senate and was deleted by the Conference Committee. *See* Conf.Rep. No. 2327, 89th Cong., 2d Sess. (1966), *reprinted in* 3 U.S.Code Cong. & Admin.News, pp. 4526, 4531 (1966).

the time of trial. (Tr. 204–205, 438, 802–803). At the time of trial no processing of alumina from kaolin had yet begun in Georgia but the Court can take notice of the fact that the new national interest in self sufficiency in important mineral supplies, and the increasing costs of the supplying nations, could accelerate such a development. (Tr. 805, 1358).[4]

### 73.

The Plaintiff customarily did not borrow money from outside sources to finance the extensions of its tracks but paid for them out of its own resources. In the major track extension of 1957, Plaintiff borrowed money from members of the Tarbutton family including Plaintiff's present managers. (Tr. 637–638). Plaintiff's managers viewed major track extension as an investment from which little or no return would be received during the initial year or so of plant construction and the actual return would be over a long period of years. Based upon Plaintiff's experiences with the track extension in 1957, Plaintiff's managers felt that internal financing might be essential in securing the approval of the Interstate Commerce Commission which would be required for a track extension. (Tr. 170, 179–185, 691–694, 1362–1363). In agreeing during the taxable years to extend their tracks to meet the needs of customers for new plant locations, Plaintiff's managers intended to finance internally the acquisition of land for rights-of-way and the construction of the road bed and the laying of tracks. (Tr. 1362).

### 74.

Plaintiff's managers were reasonable in seeking to secure additional industrial development on their road and in agreeing to provide spurs and sidings and extend their lines to more remote sites selected for major new plant construction. Plaintiff could not reasonably give such assurances without having the ability to carry them out. Plaintiff's managers were reasonable in their estimates that during the taxable years the Plaintiff's business needs for industrial development were not less than $1,000,000. (Tr. 748, 854, 956–957). In view of the cost during the taxable years of $150,000 per mile for new track extensions, the sum of $1,000,000 would have covered only about one-half of the probable cost of the two projects alone which were considered "red hot" prospects at the close of the taxable years.

### F. Insurance Reserve

### 75.

Prior to February 14, 1966, Plaintiff carried no public liability insurance against claims for personal injury or property damage to others. It was difficult for a shortline railroad to secure adequate public liability insurance at reasonable costs and it was not unusual for both mainline railroads and shortline railroads to be self-insurers in this respect. Moreover, Plaintiff carried no insurance against accidental damage to its own properties. (Tr. 229–245, 1492–1495).

### 76.

At the annual meeting of Plaintiff's directors on December 17, 1964, it was reported to the directors that the company was incurring the risk of operating without public liability insurance. A motion was made to set aside securities in the amount of $250,000 in accordance with Interstate Commerce Commission account number 772, in order to provide insurance against such claims. (P. Ex. 14, Minutes of Directors Meeting of December 17, 1964 and Stockhold-

---

4. Not in the record but of interest are items of current news attached as Exhibits B and C to these Findings of Fact and Conclusions of Law. Of interest also is a right lengthy Article in the Wall Street Journal of March 6, 1974, covering the efforts of Toth Aluminum to extract alumina from ordinary red Georgia clay.

ers Meetings of December 17, 1964 and December 13, 1965). This reserve was thereafter carried on the books throughout the taxable years, although no securities were specifically designated for this purpose. (Tr. 229, 244–245, 1492, 1527–1528).

### 77.

On February 14, 1966, following the December 26, 1965 wreck of the *Nancy Hanks*, Plaintiff's managers obtained "additional insurance" against public liability in the amount of $250,000 with $25,000 deductible. (Tr. 231, 237, 1494, 1495, 1497; P. Ex. 14, Minutes of Directors Meeting of December 10, 1966 and Stockholders Meeting of December 10, 1966). Upon the renewal of this policy a year later, it was increased to an amount of $500,000 with $25,000 deductible. (Tr. 232, 237, P. Ex. 13(a)–(e)). The Plaintiff's managers considered that the $250,000 insurance reserve was essential despite the contractual insurance coverage and maintained the reserve on Plaintiff's books. (Tr. 244, 1344, 1494–1496). Subsequent to the end of the taxable years, the insurance coverage from outside sources was increased to $1,000,000 and the reserve was at that time dropped from the books. (Tr. 1496–1497).

### 78.

Plaintiff's operations were subject to the hazards usually associated with the operations of a railroad though confined only to a few miles of road. Plaintiff had approximately 24 open public crossings on its road, and 10 to 15 private crossings. (Tr. 1343). Of these, five or six were on busy roads and one was described as especially hazardous. (Tr. 949–950).

### 79.

During the taxable years Plaintiff had several accidents of the type which could have required Plaintiff to pay out large amounts on damage claims. The 1965 *Nancy Hanks* wreck itself resulted in over one hundred claims against Plaintiff for personal injury, including one suit for $500,000 by the engineer of the *Nancy Hanks*, none of which was covered by an insurance policy. (Tr. 217, 221–224; P. Ex. 12). Substantial claims against Plaintiff on the part of the Southern Railway for property damage also resulted from the *Nancy Hanks* wreck. (Tr. 224–225). The personal injury claims were eventually settled by 1967 for approximately $147,000, and the Southern Railway claim was settled for $24,000 to $25,000. (Tr. 224, 225). There were other personal injury claims during the taxable years including one by a child who lost a limb when run over by one of Plaintiff's cars. (P. Ex. 14, Minutes of Directors Meeting of December 10, 1966).

### 80.

Taking into account the initial self insurance reserve plus the additional insurance acquired in 1966 and 1967, Plaintiff was never overinsured. (Tr. 854–855, 1344). The maintenance of self insurance was not unusual for a railroad and was recognized by the Interstate Commerce Commission. (Tr. 834–835, 951). The self insurance reserve of $250,000 was a reasonable business need of the Plaintiff for each of the taxable years 1965 through 1969.

### G. *Need for Office Building and Maintenance Shop*

### 81.

Plaintiff asserts that during the taxable years it had a need for a new office building and a new maintenance shop. The office building used during the taxable years, and at the time of trial, was an old one-story building erected around 1893, the year of the founding of the railroad itself. (Tr. 143–144). This building has two offices, a storage area and a loading platform on the rear. (Tr. 144, 155; P. Ex. 5(i)). With the increase in the Plaintiff's office staff, the

offices had become extremely crowded. (Tr. 153). The two principal officers of the company and the office manager occupied one of its two principal offices. (Tr. 154). Four or five employees had desks in the other principal office. (Tr. 153). The train crews had lockers in a general storage area subsequent to the taxable years. (Tr. 155; P. Ex. 5(f), (g) and (h)). A portion of the office operations were placed in temporary facilities in a nearby cotton warehouse in 1971. (Tr. 155–156; P. Ex. 5(j), (k)).

## 82.

The offices had no provision for meetings. Meetings with business guests from out of the city were held in the board room of the local hospital or at the homes of Plaintiff's managers. (Tr. 156). Meetings of the stockholders and the board of directors were held at the home of Mrs. Ben Tarbutton, Sr. (Tr. 156–157). Business discussions held by Plaintiff's managers with business guests that were of a confidential nature had to be held "under the chinaberry tree" located adjacent to Plaintiff's offices. (Tr. 154). Meetings of employees for such matters as safety classes and rules instruction had to be held in the warehouse area. (Tr. 154–155). Plaintiff's offices were crowded, cluttered and did not provide a good appearance to outsiders or an attractive working environment for employees. (Tr. 153, 156).

## 83.

During the taxable years Plaintiff had an old and very small maintenance shop erected many years earlier when the Plaintiff had only limited rolling stock. (Tr. 162; P. Ex. 9(a) and (b)). As Plaintiff's rolling stock of locomotives, cars and supporting vehicles increased, it had greater need for a more adequate and more modern maintenance shop. During the course of the controversy between Plaintiff and Magor over the failure of the aluminum cars, one defense raised by Magor and conceded as plausible by the Plaintiff was that the cars had not been adequately maintained. (Tr. 129–130, 166–167, 1502; P. Ex. 17).

## 84.

Both before and during the taxable years Plaintiff's managers recognized the need for new office facilities and an adequate maintenance shop. (Tr. 152, 157, 1345, 1501). Both before and during the taxable years they visited several other shortline railroads to inspect their shops as an aid in planning Plaintiff's maintenance shop. (Tr. 165–166, 1347, 1501–1503). In 1964, Plaintiff's managers utilized a related corporation to purchase land which had been selected by them as a site for a new office building and maintenance shop. (Tr. 152, 161). During the taxable years Plaintiff's managers were urged by two of its directors, Mrs. Ben Tarbutton, Sr. and B. T. Rawlings, to move ahead with plans for the building and the shop. (Tr. 161, 1123–1124). Mrs. Tarbutton, Sr. felt that these facilities were inadequate and she expressed herself as being very much in favor of replacement. (Tr. 161–162, 1123–1124, 1132–1134). Plaintiff's managers had no question at the time that these facilities were needed and should be added. They intended to pay cash for these facilities and felt that Plaintiff had other more pressing financial needs and therefore for that reason should not spend the money at that time for these facilities. (Tr. 157, 160, 1345, 1363). A second reason for the postponement of the addition of these facilities was that the time of Plaintiff's managers was fully consumed with other problems of the railroad and they felt they did not have the time to see that a proper job was done in adding a new office building and a maintenance shop. They felt that they were still learning many aspects of a railroad's operations and that "it takes time to intelligently spend money." (Tr. 1347, 1501–1503). A third reason for the postponement of the maintenance facility was the unsuc-

cessful attempts to locate and hire a satisfactory and experienced maintenance supervisor, a necessary step before the maintenance facility would be of utility. (Tr. 167, 1347–1348). The site for the new office building and new maintenance shop was acquired from the related corporation by purchase in 1971 and in that same year the site was graded and leveled for construction of the office and shop. (Tr. 153, 157, 1346–1347). By the time of the trial a second set of architectural plans had been obtained on the new office building. (Tr. 157–158; P. Ex. 6, 7 and 8). Several years prior to the trial, Plaintiff had engineering work and drawings prepared for its planned shop, and by the time of trial, a new employee had been added who was expected to have responsibility for the management and direction of the maintenance shop. (Tr. 157, 167, 1347–1348).

85.

Plaintiff's managers estimate that during the taxable years, the cost of the facilities would have been $150,000 for the office building and furnishings and $130,000 to $150,000 for the maintenance shop and initial basic equipment. (Tr. 168–169, 954, 1500). These estimates seem modest and each constitutes a reasonable business need of the Plaintiff for the taxable years.

### H. *Need for Trucking Operation*

86.

Prior to and during the taxable years, Plaintiff's managers felt that it would be important to the Plaintiff to acquire a trucking operation to supplement its railroad's operations. (Tr. 245–247, 1348, 1389). In 1965 or 1966, they negotiated with the owner of a trucking company about acquiring his operation but they declined the owner's offer to sell because the transaction would have required the purchase of land which they did not want. (Tr. 246, 1348, 1389). They contemplated that a supplementary trucking operation, among other things, would carry kaolin on short hauls, primarily intrastate, to customers ordering less than car load lots or customers not located on the railroad. They felt they could also serve other customers of the road. (Tr. 245–247). They contemplated doing this through Plaintiff's formation of a corporate subsidiary and its contribution of sufficient funds and financial backing to permit the subsidiary to start business. They contemplated that the initial capital contribution by the Plaintiff to such a venture would be not less than $100,000. (Tr. 251, 1348–1349, 1503). They did organize such a subsidiary and contributed $100,000 to it in 1971. (Tr. 247, 251). The subsidiary, known as B–H Transfer Company, first began doing business during the latter part of the eighteen-day railroad strike in July, 1971, and served Plaintiff's customers who were not able to receive or dispatch shipments by rail during the period of the strike. (Tr. 684, 711, 1389–1390). The B–H Transfer Company purchased the franchise that the Plaintiff's managers had discussed buying from its previous owner in 1965. (Tr. 247, 250).

87.

Most trunk line railroads have trucking subsidiaries to supplement their rail service. (Tr. 835, 901). The plans for extension into a subsidiary trucking operation was a reasonable need recognized by Plaintiff during the taxable years and the estimate of $100,000 as the initial investment is a reasonable one. (Tr. 251).

### I. *Repairs to Aluminum Hopper Cars*

88.

As noted above, in early 1968 Plaintiff began experiencing the structural failure of the fifty aluminum covered

hopper cars it had acquired from Magor Car Corporation in 1965. Plaintiff secured an independent estimate of repair costs of $2,000 per car. Plaintiff brought suit against Fruehauf Corporation, Magor's successor, to recover repair costs and damages, but liability was strongly denied. Plaintiff's officers recognized at the end of 1968 that the cars had to be repaired and that Plaintiff might have to bear the full cost. (Tr. 1504; P. Ex. 14, Minutes of Directors meeting of November 7, 1968 and December 13, 1968).

89.

Plaintiff's controversy with Fruehauf was settled on the basis of a sharing of repair costs. The earlier repair estimate had proven too low, and Plaintiff anticipated a $100,000 repair cost at the end of 1969. The repair of the cars was completed in early 1970 at a cost to Plaintiff of approximately $94,000. Plaintiff had a reasonable business need at the end of 1968 and 1969 for these repairs in the amount of $100,000. (Tr. 1349, 1528–1529).

## J. *Recapitulation of Needs*

90.

To recap, the total of Plaintiff's reasonable and reasonably anticipated needs were as follows (rounded to the nearest dollar):

| | 1965 | 1966 | 1967 | 1968 | 1969 |
|---|---|---|---|---|---|
| Working Capital Needs | $ 189,771 | $ 284,406 | $ 266,587 | $ 295,680 | $ 342,696 |
| Covered Hopper Cars | $1,850,000 | $1,850,000 | $1,850,000 | $3,700,000 | $3,700,000 |
| Locomotives | $ 157,824 | $ 157,824 | $ 157,824 | $ 171,948 | $ 171,948 |
| Roadway & Roadway Equipment | $ 21,202 | $ 26,521 | $ 45,206 | $ 128,142 | $ 128,142 |
| Industrial Development Needs | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 |
| Insurance Reserve | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 |
| Office Building | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 | $ 150,000 |
| Maintenance Shop | $ 130,000 | $ 130,000 | $ 130,000 | $ 130,000 | $ 130,000 |
| Trucking Subsidiary | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| Repairs to Aluminum Hoppers | $ –0– | $ –0– | $ –0– | $ 100,000 | $ 100,000 |
| Total: | $3,758,797 | $3,948,751 | $3,949,617 | $6,025,770 | $6,072,786 |

IV. *Assets Available to Meet Needs*

A. *According to Plaintiff's Books*

91.

A comparative statement of the assets and liabilities of Plaintiff at the end of each of the taxable years 1960 through 1969, as reflected on a cost basis as on the books of the corporation, and as stipulated to by the parties, is attached as Exhibit D to these Findings of Facts and Conclusions of Law. (P. Ex. 1, Stip. Ex. F).

92.

The first determination is whether during the years in question, the excess of current assets over current liabilities, if any, exceeded working capital needs so as to leave available funds which might have been used to pay additional dividends or meet other corporate needs. This requires a review of current assets (as reflected on Plaintiff's books), current liabilities, net current assets (or net working capital), and total corporate needs, as follows (P. Ex. 1, Stip. Ex. F; P. Ex. 29):

|  | Current Assets | Current Liabilities | Net Current Assets (or Deficit) | Corporate Needs |
|---|---|---|---|---|
| 12/31/65 | $231,635.33 | $373,615.64 | ($141,980.31) | $3,758,797 |
| 12/31/66 | $341,045.32 | $372,372.39 | ($ 31,327.07) | $3,948,751 |
| 12/31/67 | $242,191.22 | $324,246.52 | ($ 82,055.30) | $3,949,617 |
| 12/31/68 | $378,342.31 | $357,150.41 | $ 21,191.90 | $6,025,770 |
| 12/31/69 | $690,224.59 [5] | $365,570.18 | $324,654.41 [5] | $6,072,786 |

93.

It is apparent from the foregoing that Plaintiff did not have available in net current assets, as shown on its books, funds available to meet current needs of the corporation and certainly not to pay additional dividends. Defendant contends, however, that stock in the Citizens & Southern National Bank ("C&S Bank") and in the Southern Railway Company ("Southern Railway"), included on the books of the company within the category "Investments," should be considered current assets available for dividends and other needs. According to the Revenue Agent who made the audit for 1968 and 1969 this is the crux of Defendant's case, and he virtually concedes that if these securities included in "Investments" are not deemed to be available to meet current needs and pay dividends, then Plaintiff should prevail in this action. He testified that he originally considered these securities to be business "related"—that he had made the statement that if plaintiff had $5,000,000 that would not be too much for what Plaintiff's managers indicated to him they needed but that he could not take it into consideration because "there was [*sic*] no definite plans for this amount." (Tr. 1569). Plaintiff, on the other hand, contends that the securities in question are related business assets which contribute to the support and success of its operations and should not be considered as current assets available to pay dividends. Although Plaintiff contends further that its available assets did not exceed corporate needs during any of the taxable years involved even with these securities included as current assets, a determination may first be made as to whether or not these securities constitute related business assets.

5. Including the $170,000 earmarked for the locomotive purchase by Plaintiff's managers.

## B. *Related Securities*

### 94.

The two investments in question consist of common stock in the C&S Bank and common and preferred stock of the Southern Railway. Although the questions regarding Plaintiff's relationship to these holdings need to be discussed separately, they have elements in common.

### 95.

In its efforts at industrial development, Plaintiff was unknown and suffered from a stigma of financial instability widely associated with shortline railroads. (Tr. 794). In recent decades many shortline railroads have disappeared as independent entities either through acquisition by a mainline road or a shipper or discontinuance of service. (Tr. 267–269, 612, 856–857). As one of Plaintiff's directors, called by Defendant, expressed it, "Most of the small shortline railroads have been gobbled up by the major roads." (Tr. 1680). Plaintiff sought to develop a financial position which, combined with a record of outstanding performance, would overcome this handicap and induce millions of dollars of new industrial development on its line. (Tr. 254, 269, 748).

### 96.

Through two generations and three decades Plaintiff emphasized and relied strongly upon two business relationships, one its bank and the other its mainline railroad connection. Over the three decades from 1940 to 1970 the maintenance of close, harmonious and cooperative relationships with these two institutions aided Plaintiff in overcoming the reputation of unreliability and uncertainty usually associated with shortline railroads. (Tr. 748–751, 795–797, 1286). It also contributed to greater efficiency and effectiveness in Plaintiff's operations. The value of these relationships to Plaintiff, with its ambitious program of growth, requiring great investment by itself, and far larger investments by its customers, is evident. Customers knew of these relationships and relied on them. (Tr. 443–446, 504–506). Plaintiff's managers clearly believed that the stock ownership had contributed and could contribute materially to these valuable relationships. (Tr. 1284, 1288–1289).

### 97.

At the death of their father in late 1962, Ben and Hugh Tarbutton were young and relatively inexperienced in railroad management. (Tr. 1286). Their assumption of the responsibilities of management was followed in a few months by the acquisition of the Central of Georgia by the Southern Railway, a former competitor. (Tr. 1286, 1394–1396). Ben and Hugh Tarbutton felt that Plaintiff faced a serious problem of credibility with its customers and potential customers in regard to its continued viability as an effective independent shortline railroad. They believed that continued ownership of the C&S Bank stock, purchased through a management decision by their father, and purchase of Southern Railway stock would help to maintain the credibility of the railroad during these years of crisis. (Tr. 1279–1285, 1288).

### 98.

Plaintiff's managers felt that the ownership of the bank and railway stocks provided also an important support for the assurances and commitments which they were giving to others in regard to the willingness of the railroad to expand its tracks and equipment to meet the needs of other corporations contemplating expansion on Plaintiff's railroad. (Tr. 256). The stocks were expected to provide a regular return which would help to underwrite the cost of carrying major equipment obligations. Thus the ownership of these securities permitted the management to proceed with major corporate planning and commitments. In this connection, Plaintiff's experiences in securing an extension of its lines in 1957, despite protests urged before the Interstate Commerce Commission that

the railroad should not incur the financial risk, impressed upon Plaintiff's managers the importance in their corporate planning of having adequate resources available to show regulatory authorities that they could readily support a major extension. (Tr. 170, 179–185, 691–694, 1362–1363).

### 99.

In addition to the foregoing contributions attributable to both investments, the ownership of each is supported by aspects of the history and current operations of Plaintiff relative to that particular investment.

### C&S Bank Stock

### 100.

Over a period of years beginning in the early 1940's and ending by 1960, Plaintiff from time to time purchased common stock in the Citizens & Southern National Bank of Georgia, a major bank of the Southeast and the largest in Georgia. (Tr. 256–257). These purchases were made under the direction of Ben Tarbutton, Sr. who felt that the stock ownership contributed to a strong banking relationship between the C&S Bank and Plaintiff which would prove very beneficial to Plaintiff over the years. (Tr. 256–257, 1287). At the time of the death of Mr. Ben Tarbutton, Sr., Plaintiff's investment in C&S Bank stock amounted to $364,907 and continued at this level during the years in suit. (P. Ex. 1, Stip. Ex. I and J).

### 101.

Railroads are highly capital intensive and their needs for capital have caused them traditionally to develop strong banking relationships. For example, the State of Georgia's first railroad bore the name Georgia Railroad and Banking Corporation, indicating the close traditional relationships between railroading and banking. (Tr. 859–860). Establishing a strong banking tie is difficult for a shortline railroad. (Tr. 958). Plaintiff's managers were advised by

their father that the C&S Bank relationship was a very valuable one to Plaintiff and that the stock should be held by Plaintiff as a continuing investment. (Tr. 257, 1288). Similar advice was received from the president of the Central of Georgia Railway, Mr. Dillard. Plaintiff's managers accepted this advice and were in accord with their father's reasoning about the value to the corporation of maintaining the banking relationship and the stock ownership. (Tr. 1287–1289, 1410–1411). The additional number of shares that were acquired from time to time after the death of Mr. Ben Tarbutton, Sr. were through stock dividends and stock splits. (P. Ex. 1, Stip. Ex. J; Tr. 1411).

### 102.

For some years prior to his death, Mr. Tarbutton, Sr. had served as a member of the C&S Bank's Board of Directors. (Tr. 257). At the time of trial both of Plaintiff's managers were serving on this Board. (Tr. 62, 257, 1259). At a stockholders meeting in 1970 or 1971, the chief executive officer of the C&S Bank reported that the ownership of the Tarbutton family group was second only to that of his own family among the Georgia stockholders of the C&S Bank. (Tr. 717). The C&S Bank had stockholders outside of the State of Georgia whose ownership was greater than that of the Tarbutton family interest, but these were primarily institutional holders. The relationship of Plaintiff's managers to the officials and other personnel of the C&S Bank was close. Plaintiff's managers felt that Plaintiff benefited many ways from the close relationship, and the mutual confidence which flowed from it. (Tr. 257–259, 643, 1288).

### 103.

Plaintiff had for many years looked to the C&S Bank as the source of its funding on equipment purchases and for such other needs for major funding as might arise. (Tr. 643). All of its financing of equipment purchases of cov-

ered hopper cars during the decade of the 1960's and in later years has been with the C&S Bank. (Tr. 258). Plaintiff's customers felt greater assurance that Plaintiff's commitments to acquire additional cars and motive equipment would be fulfilled because of Plaintiff's relationship with the C&S Bank. (Tr. 443). Plaintiff's officers have also been able from time to time to assist their customers in establishing banking relations with the C&S Bank, to the advantage of both Plaintiff and the C&S Bank. (Tr. 259, 443).

104.

The C&S Bank had one of the most active industrial development offices of the State. Plaintiff's managers worked closely with this office and received continued assistance from it. (Tr. 257–258, 641, 1288–1289). In working with potential customers in its industrial development activities, Plaintiff's managers found the C&S Bank useful as a reference. (Tr. 257–258). Plaintiff also benefited from the general business and industrial relationships which resulted from the close affiliation between Plaintiff and the C&S Bank. It was known among the industrial development offices of the State that Plaintiff and the Tarbutton family constituted a substantial stockholder in and had a close relationship to the C&S Bank and this was utilized to support assertions as to the financial stability and reliability of Plaintiff in seeking to secure industrial plants for location on its road. (Tr. 751).

105.

The C&S Bank paid regular dividends to Plaintiff during the taxable years ranging from $20,367 in 1965 to $46,591 in 1969, or 5.6 percent to 12.8 percent of the original investment of $364,907. (P. Ex. 35, December 31, 1965 and December 31, 1969 Financial Statements). The stock had appreciated substantially in value and, based upon the prices at which shares were being sold at the low point and at the end of each year in the over-the-counter market, had a gross val-

ue at the end of each taxable year as follows (P. Ex. 1, Stip. Ex. I):

| Year | Gross Value—<br>Low for Year | Gross Value—<br>Year End |
|------|------------------------------|--------------------------|
| 1965 | $1,069,278 | $1,132,925 |
| 1966 | $1,050,187 | $1,190,212 |
| 1967 | $1,170,590 | $1,370,082 |
| 1968 | $1,385,049 | $1,973,801 |
| 1969 | $1,938,196 | $2,161,834 |

106.

The C&S Bank stock served the dual purpose of supporting a strong banking relationship which was helpful to Plaintiff in its own financing and in its own relationships with customers and potential customers, while at the same time providing current income and strengthening the current financial statement of Plaintiff. (Tr. 750–751). It was a related business asset which the Plaintiff was justified in holding during the taxable years as a long-term business investment and it should not be considered as a current asset available for the payment of dividends. (Tr. 957–959).

*Southern Railway Stock*

107.

Prior to the acquisition of the Central of Georgia Railway by the Southern Railway in June 1963, Plaintiff had for many years maintained a very close and advantageous working relationship with the Central of Georgia. Ben Tarbutton, Sr. had served for many years on the Board of Directors of the Central of Georgia and for several years as its president. (Tr. 82). Immediately after his death, Hugh Tarbutton was named as a member of the Board of the Central of Georgia and has continued to hold that position ever since. (Tr. 1258). Plaintiff and the Tarbutton family had been substantial stockholders in the Central of Georgia over a period of years prior to the mid-1950's, when control of the Central of Georgia was acquired temporarily by a western railroad, and this stock ownership had contributed to the very valuable relationship existing between Plaintiff and the Central of Georgia. (Tr. 259, 1286–1288). The Cen-

tral of Georgia constituted the only outlet of the Plaintiff for the shipment of the goods of its customers; Plaintiff's officers recognized the necessity of having the assistance and cooperation of the Central of Georgia and its officers and employees if Plaintiff were to be able to provide for its own customers the kind of service that would attract people to its road and would lead to substantial industrial expansion on its road. Plaintiff's officers were highly satisfied with the relationship with the Central of Georgia and the services provided by the Central of Georgia.

108.

When the Central of Georgia was acquired by the Southern Railway, a much larger line than the Central of Georgia with interests extending over a much larger area of the country, this gave Plaintiff's new managers great concern about the future relationship between Plaintiff and the Southern Railway. (Tr. 106–107, 1394–1396). They realize that a short-line railroad would have great difficulty in continuing as a viable, profitable entity without the cooperation and support of its mainline connection. (Tr. 259–260, 769). Important customers of Plaintiff were concerned about the effect the acquisition of the Central of Georgia would have upon the service provided to them by Plaintiff. (Tr. 416, 444–445). The takeover by Southern brought about abrupt changes in the former operating policies of the Central of Georgia. By reason of the take-over, the status of many services being received by Plaintiff from the Central of Georgia at the discretion of the Central were put in question. (Tr. 106–107). It also brought into question the status of the division of fees between the Southern Railway and Plaintiff which was critical in regard to the profitability of Plaintiff's operations. (Tr. 1439–1440). Although Mr. Dillard remained as president of the Central of Georgia which continued for a time as a subsidiary of the Southern

Railway, Plaintiff's managers realized that he was at retirement age and would be replaced within a few years. (Tr. 769–770).

109.

As a consequence of their concerns, Plaintiff's managers considered the desirability of attempting to strengthen their relationship with Southern Railway by buying Southern Railway stock. (Tr. 259, 769, 1279–1280, 1284). Plaintiff's managers consulted with Mr. Dillard and were advised by him that it would be in the long-range interests of Plaintiff to purchase Southern Railway stock, and they strongly agreed. (Tr. 260, 644, 752–753, 1283–1284). He pointed out that the top management of a publicly-held company such as Southern Railway was by necessity aware of and interested in its major stockholders, and he pointed out the various ways in which such a relationship could indirectly be helpful. (Tr. 260, 263, 752–753, 1283–1284). This was not an unreasonable expectation. (Tr. 859, 961–962).

110.

Prior to the death of Ben J. Tarbutton, Sr., Plaintiff had accumulated a portfolio of stocks and bonds which it held in reserve to meet the corporate needs of the business. At the end of 1962, a few months after Mr. Tarbutton, Sr.'s death, the investment in this portfolio, which did not include the C&S Bank stock, amounted to $339,864.[6] At a special meeting of the Board of Directors on December 4, 1963, the management secured authority to sell securities from the portfolio to invest in Southern Railway common stock. The minutes report the following:

"It was pointed out by management the difficulties in operations resulting from Central's acquisition by Southern Railway Company and the need for the Sandersville to become more closely allied with Southern because this company is entirely and

---

6. December 31, 1962 balance sheet figure for stocks and bonds ($704,744) less cost of C & S Bank stock ($364,880). (D.Ex. 13(h), December 31, 1962 Balance Sheet).

totally dependent upon Southern for equipment and all other services it had relied upon Central for such as: interline work and settlement, car accounting, per diem account and settlement, locomotive and car maintenance and repairs, and various traffic services essential to the well being of this company.

"Management ask [sic] authority to purchase Southern Railway common stock to more closely ally itself to Southern, management states this is a highly desirable policy to follow in the future for the above stated reasons. Permission requested and granted to sell the following listed securities for this purpose:

200 Shs. Champion Papers Inc.
200 " General Electric Co.
400 " Savannah Sugar Refining Co.
100 " Coca-Cola Co.
416 " Southern Nitrogen Co.
300 " Savannah Electric Co.
100 " United Family Insurance Co.
51 " Howard Johnson

"Authority granted and meeting adjourned".

111.

Pursuant to the decisions reached at the special stockholders meeting of December 4, 1963, Plaintiff proceeded over the course of the next several years to liquidate its portfolio of unrelated securities and to buy stock of the Southern Railway. (Tr. 1283). For the period from 1963 to 1969, all purchases of stock by Plaintiff cost $832,896, (excluding the temporary cash investment of $44,500 in Franklin Mint stock in 1969) while the net proceeds (after tax) to Plaintiff from sales of its diversified portfolio were $549,991, so that only the difference, $282,905, represented "new" funds invested in securities. (P. Ex. 27). Initially, Plaintiff purchased common stock of Southern Railway but switched to the purchase of preferred stock when it was pointed out by Mr. Dillard that through the purchase of preferred stock they could secure several times as much voting power as through the purchase of common stock and would in addition have an assured return. (Tr. 262, 753, 1408–1410). The preferred stock consisted of a stock of $20 face value with a five percent cummulative dividend. The cost basis of the Southern Railway common and preferred stock held by Plaintiff at the end of each year and the gross value of such holdings, based upon the prices at which shares were being sold at the low point and at the end of each year, were as follows (P. Ex. 1, Stip. Ex. I):

| Year | | Aggregate Cost | Gross Value— Low for Year | Gross Value— Year End |
|------|---------|---------|---------|---------|
| 1965 | common | none | none | none |
| | preferred | $180,714 | $172,125 | $175,500 |
| | total | 180,714 | 172,125 | 175,500 |
| 1966 | common | $ 41,897 | $ 39,750 | $ 42,250 |
| | preferred | 320,233 | 270,600 | 274,700 |
| | total | 362,130 | 310,350 | 316,950 |
| 1967 | common | $ 41,897 | $ 42,375 | $ 46,750 |
| | preferred | 575,172 | 474,925 | 478,850 |
| | total | 617,069 | 517,300 | 525,600 |
| 1968 | common | $ 41,897 | $ 44,500 | $ 62,500 |
| | preferred | 674,622 | 561,000 | 579,700 |
| | total | 716,519 | 605,500 | 642,200 |
| 1969 | common | $ 41,897 | $ 42,250 | $ 46,375 |
| | preferred | 674,622 | 486,200 | 504,900 |
| | total | 716,519 | 528,450 | 551,275 |

**112.**

Plaintiff's managers worked diligently to develop favorable working relationships between Plaintiff and the Southern Railway and believe that their program of stock acquisition contributed to this effort. (Tr. 259–263, 1284–1285; P. Ex. 14, Minutes of Directors Meeting of December 13, 1964). The Southern Railway was very helpful to Plaintiff in settling the claims against Plaintiff arising out of the *Nancy Hanks* wreck, for the settlements were handled entirely by the Southern's claims department at no cost to Plaintiff. (Tr. 260). Plaintiff also was able to make a satisfactory settlement with the Southern Railway for damages to Southern Railway property resulting from the accident. The chief executive officer and other officers of the Southern Railway made what Plaintiff's managers feel was an important visit to the road in the spring of 1966, visiting with Plaintiff's representatives and with its customers and discussing with Plaintiff the need for covered hopper cars, particularly the need for Southern to replace cars from other mainline railroads. The industrial development office of the Southern Railway on occasion assisted Plaintiff in attempting to secure new customers, although in other instances the two roads could be in competition in seeking new customers. (Tr. 262). The Southern Railway, during the years in suit, performed all of the complex interline car accounting and freight accounting for Plaintiff, at no cost to Plaintiff. (Tr. 260–261). The Southern Railway provided locomotive maintenance to Plaintiff, a valuable service since Plaintiff had no maintenance facility of its own. (Tr. 261).

**113.**

The industrial development offices of the state, in advocating Plaintiff's road as a potential site for new plant location, would on occasion make reference to Plaintiff's ownership of stock in the Southern Railway. This was intended to give assurance to the customer of the good relationships and mutual confidences existing between Plaintiff and its mainline connection. The manager of Plaintiff's major customer testified that during the taxable years he was advised by Plaintiff of its ownership of stock in the Southern Railway and that he had let Plaintiff's managers know that this gave his company greater assurance of continued good relationships between the shortline railroad and the mainline connection. (Tr. 444–445).

**114.**

As a result of its program for acquiring voting stock in the Southern Railway, Plaintiff by the end of the taxable years involved had acquired 38,400 voting shares, all but 1,000 shares of which were represented by preferred stock. (P. Ex. 31) Although this represented but 0.4 percent of the total voting power of the corporation, it was far above the average voting power of all shareholders in the company, which amounted to 284 votes per shareholder at the end of 1969. (P. Ex. 31). Plaintiff's managers felt that it would be in the interest of Plaintiff to acquire additional voting power and, because Plaintiff could not in their judgment afford any additional investment, Ben and Hugh Tarbutton each acquired individually approximately 5,000 shares of Southern Railway preferred stock. They would not have made such an investment except for their desire to strengthen the relationship between Plaintiff and Southern Railway. (Tr. 263–264).

**115.**

Because of purchases below par, resulting in an average basis per share of approximately $19.30 in 1965 through 1967 and of $18.04 in 1968 and 1969, the average yield to Plaintiff on its Southern Railway preferred stock during those

years was from 5.2 to 5.4 percent. (Tr. 262–263; P. Ex. 1, Stip. Ex. I). In addition to yielding this return, the preferred stock was considered by Plaintiff's managers as providing financial support for its corporate needs, including both the extensive car acquisition program and its major industrial development potential. Plaintiff's managers felt that the stock would provide a basis for credit or in an emergency be available for liquidation into cash for direct investment in corporate needs. Thus, it permitted Plaintiff's managers to proceed with major corporate planning and major corporate commitments, knowing that funds could be made available. (Tr. 1284–1285).

### 116.

The Southern Railway stock acquired by Plaintiff, like the C&S Bank stock, served a dual purpose, first strengthening a very important business relationship between Plaintiff and its mainline railroad connection, and second contributing strongly to the financial strength and stability of Plaintiff and providing a good return. Plaintiff was justified in acquiring the Southern Railway stock to serve this dual purpose. Plaintiff's managers were reasonable in concluding that the stock over the long run would contribute toward strengthening the relationship between it and the Southern Railway. (Tr. 752–753, 859, 961–962). Although the stock was held with the expectations that it could be liquidated in an emergency to meet corporate needs, it should be considered a related business investment contributing to the ongoing operations of Plaintiff and not as a current asset available for the payment of dividends.

### 117.

The Revenue Agent who examined the taxable years 1968 and 1969 initially decided that the stocks held in the C&S Bank and the Southern Railway Company were business related securities and thus not includible in current assets. (Tr. 1563). He prepared his report without proposing a penalty under section 531 even though he knew that another Revenue Agent had reached a contrary conclusion on these securities with respect to the taxable years 1965, 1966, and 1967. (Tr. 1563–1564). After being advised of the inconsistency and that he should study further the related security issue, he concluded upon further research and discussion, but no further gathering of facts, that the stock holdings were too minimal for there to be any effective control over either of the large companies so as to secure favorable treatment, particularly not in a regulatory company. (Tr. 1578–1580). The Agent, however, was satisfied from the facts that Plaintiff (1) had a long banking relationship which it considered valuable, and which would have been useful as a reference to customers and in other ways, and (2) that Plaintiff had a very close, intimate and critical relationship with the Southern Railway Company. (Tr. 1580).

### V. *Comparison of Plaintiff's Business Needs with Its Available Assets*

### 118.

As noted above, the reasonable foreseeable needs of Plaintiff at the conclusion of the years, 1965, 1966, and 1967 approximated $4 million and at the end of 1968 and 1969 these needs approximated $6 million. These needs are far beyond the assets available to the corporation to meet needs, that is, assets not otherwise already committed to corporate purposes, even with the inclusion of the C & S Bank stock and the Southern Railway stock as current assets. (Tr. 867–869). This is true treating these securities at current value less cost of sale and capital gains taxes. *See* Ivan Allen Co. v. United States, 493 F.2d 426 (5th Cir. 1974).

Assets available to meet Plaintiff's business needs, determined as contended

by Plaintiff by considering only current assets and current liabilities as shown on Plaintiff's books, were (P. Ex. 1, Stip. Ex. F; P. Ex. 29):

|  | 1965 | 1966 | 1967 | 1968 | 1969 |
|---|---|---|---|---|---|
| Current Assets | $231,635.33 | $341,045.32 | $242,191.22 | $378,342.31 | $690,224.59 [7] |
| Current Liabilities | $373,615.64 | $372,372.39 | $324,246.52 | $357,150.41 | $365,570.18 |
| Net Current Assets | ($141,980.31) | ($ 31,327.07) | ($ 82,055.30) | $ 21,191.90 | $324,654.41 [7] |

Available assets, determined by adding to the net current assets determined above the C&S Bank and Southern Railway stocks at year end fair market values, less costs of disposition (including federal capital gains taxes), were (P. Ex. 1, Stip. Ex. I; P. Ex. 29; Def. Ex. 8):

|  | 1965 | 1966 | 1967 | 1968 | 1969 |
|---|---|---|---|---|---|
| Net Current Assets | ($ 141,980.31) | ($ 31,327.07) | ($ 82,055.30) | $ 21,191.90 | $ 324,654.41 [7] |
| C & S Bank and Southern Railway Stocks | $1,058,844.88 | $1,244,309.21 | $1,581,950.56 | $2,080,196.56 | $2,146,367.96 |
| Total Available | $ 916,864.57 | $1,212,982.14 | $1,499,895.26 | $2,101,388.46 | $2,471,022.37 |

Thus, it is apparent that inclusion of the C&S Bank and Southern Railway stocks in available assets, at realizable year-end values, does not cause available assets to exceed Plaintiff's needs, as shown by the following comparisons:

| Year | Corporate Needs | Corporate Assets Available Including Securities at Year End Values Less Costs of Disposition |
|---|---|---|
| 1965 | $3,758,797 | $ 916,864.57 |
| 1966 | $3,948,751 | $1,212,982.14 |
| 1967 | $3,949,617 | $1,499,895.26 |
| 1968 | $6,025,770 | $2,101,388.46 |
| 1969 | $6,072,786 | $2,471,022.37 |

7. Including the $170,000 earmarked by plaintiff's managers for a new locomotive, since the purpose here is not to assess working capital position but to compare available assets with all needs, including locomotives and working capital.

## VI. *Plaintiff's Dividend Policy*

### 119.

Plaintiff's net income (including capital gains), after federal income taxes and before dividends, for each year in suit, Plaintiff's "accumulated taxable income" for each year as computed by defendant,[8] and the amount of actual dividends paid with respect to the year, were as follows (P. Ex. 1, Stip. Ex. G and Ex. L(2)):

|      | Net Income After Tax | Accumulated Taxable Income | Dividends Paid |
| ---- | --- | --- | --- |
| 1965 | $ 384,975.26 | $ 192,722.75 | $ 60,000 |
| 1966 | 265,732.87 | 235,035.28 | 60,000 |
| 1967 | 291,130.17 | 235,920.76 | 60,000 |
| 1968 | 329,596.56 | 280,056.08 | 60,000 |
| 1969 | 374,224.36 | 303,557.32 | 75,000 |
| Totals: | $1,645,659.22 | $1,247,292.19 | $315,000 |

### 120.

The normal corporate policy of widely held corporations is to pay dividends on a regular or consistent basis, rather than an erratic one. (Tr. 1623, 1637, 1648). It is considered desirable for such corporations to increase the amount of dividends from time to time and avoid moving in any year to a level which cannot be sustained and requires reduction in a later year. (Tr. 1638). The level of dividends of Plaintiff increased from a total of $40,000 in 1964 to $60,000 for the next four years and then in 1969 to $75,000.[9] Plaintiff was a growth company serving a growing industry. (Tr. 412–413, 900–901, 971, 1362, 1516, 1520). In contrast, much of the railroad industry was generally declining. (Tr. 856, 971). Plaintiff's growth, as measured, for example, by the increase in investment in operating assets from 1964 to 1970, was from $935,454 to $3,376,451, an increase of 261 percent, which was greater and faster than other comparable shortline railroads observed. (Tr. 869–870). The increase would have been even greater if the national credit squeeze had not thwarted Plaintiff's efforts to purchase one hundred cars in 1969. Similarly, from 1964 to 1970 Plaintiff's operating revenues increased from $712,681 to $1,558,215 or 119 percent, and its operating expenses increased from $312,282 to $647,501, or 107 percent. (Def. Ex. 13(j) and (k), tax returns and attached financial statements, 1964 and 1970). Plaintiff was described by one of the expert witnesses, who has studied the operations of shortline railroads throughout the nation, as "unique" in attempting to meet its customers' demands "by a program of accelerated capital expenditures quite unusual for a railroad of this scale and resources". (Tr. 901). Defendant's expert in corporate finance, a university professor of finance, testified that in the period of the taxable years growth firms had very high retention rates, typically paying out no dividends or less than twenty percent of earnings. (Tr. 1650–1651). It

---

8. The accumulated taxable income for each year as computed by Plaintiff is:

| | |
| --- | --- |
| 1965 | $187,617.91 |
| 1966 | 211,935.35 |
| 1967 | 225,352.89 |
| 1968 | 275,085.07 |
| 1969 | 293,175.32 |
| Total | $1,193,166.54 |

9. Faced with substantial capital acquisitions in 1970 involving cash outlays of approximately $600,000 and an income tax deficiency of approximately $518,000, dividends were decreased in 1970 to a level of $60,000. (Tr. 1754–1755).

is generally recognized that the cheapest money for a growth corporation is money internally generated. (Tr. 1645). The actual dividend policies of the Plaintiff, a growth company in the taxable years, in the payment of dividends and retention of earnings, was in accord with recognized corporate practices and principles, in the consistency and increases in dividends and in the payout rate of approximately twenty percent. (Tr. 755–756).

121.

Plaintiff's dividends in relation to its net income were not unusual for a railroad of its size, considering its commitment to growth and its program of capital acquisitions. During the period 1964 through 1969, the Plaintiff's annual dividends as a percentage of its net income (as determined by Interstate Commerce Commission accounting rules) averaged 18.5 percent. (Tr. 862). Among comparable Class II line-haul railroads (otherwise known as "shortlines") with a positive net income for each of the years 1964 through 1969, the Chattahoochee Industrial Railroad, a Georgia shortline, with net income ranging from $236,000 in 1964 to $677,000 in 1969, paid no dividends; the Corinth & Counce Railroad, of Mississippi, annually paid out an average of 23.4 percent of its income (per I.C.C. accounting) during this period; and the Modesto & Empire Traction Company, of California, paid out in dividends an average of 31.3 percent of its net income (per I.C.C. accounting). (Tr. 861–862). Similar situations occurred among the larger, Class I railroads which had positive net incomes for each of the years 1964 through 1969. For example, during this period no dividends were paid by the Baltimore & Ohio Railroad, the Florida East Coast Railroad and the Spokane, Portland & Seattle Railroad, while the St. Louis Southwestern paid out an average of 22.4 percent and the Texas & Pacific distributed 22.3 percent of its net income (per I.C.C. accounting) as dividends. (Tr. 862–864).

122.

Dividend practices of railroads differed, however, and according to two witnesses highly experienced in railroad finances testifying for Plaintiff as experts, the dividends of some mainline railroads had been too liberal in many instances. (Tr. 754, 779, 866). Many major roads are in bankruptcy or operating "in the red" today, and the opinion was expressed by these railroad experts that these roads would have been better off if they had reduced dividends and applied more earnings to the purchase of equipment. (Tr. 754, 755, 865, 866). For example, the policy of the Central of Georgia, when it was a widely held corporation, had been to pay out 25 percent to 30 percent of earnings if earnings were good and if it was estimated that it could meet its program of capital expenditures, but the former president of the Central of Georgia, one of the two experts, now believes that it should not have paid out more than 12½ to 15 percent of earnings. (Tr. 780–781). The now bankrupt Penn Central Railroad had a history of very high payout percentages. Prior to the merger of the New York Central and the Pennsylvania Railroad in 1968, the New York Central paid out approximately forty-two percent of its net income until 1967, when it had a 125 million dollar net income deficit. Despite the 1967 deficit, it paid dividends of $21.5 million in 1967. The Pennsylvania Railroad paid out fifty-nine percent of its net income in 1964, eighty-two percent in 1965, seventy-one percent in 1966, and $33.5 million in 1967 despite a $135 million net income deficit. Following the merger, the Penn Central continued to experience increasing operating deficits, yet continued substantial dividends until its bankruptcy in 1970. (Tr. 864–865). In the opinion of both railroad experts presented by Plaintiff, the Penn Central's dividend policy and that of its predecessors contributed materially to its financial chaos. (Tr. 754, 866). Plaintiff's managers were influenced in their dividend decisions by

their observations of the history and practices of the nation's other railroads. (Tr. 269).

VII. *Absence of Tax Avoidance Intent*

123.

Defendant asserts that in each of the years 1965 through 1969 the corporation, in the words of section 532(a) of the Internal Revenue Code, was "availed of for the purpose of avoiding the income tax with respect to its shareholders . . . by permitting earnings and profits to accumulate instead of being divided or distributed." Plaintiff's earnings were accumulated to meet the reasonable needs and reasonably anticipated needs of the business but, in any event, the accumulations were made to meet what Plaintiff's officers and directors in good faith thought to be the needs of the business, and avoidance of taxes on shareholders did not enter into the formulation or execution of the dividend policy.

124.

The proposal with respect to Plaintiff's dividends was formulated each year by Ben and Hugh Tarbutton and presented by them to the Board of Directors. (Tr. 264, 1124–1125, 1139, 1360, 1515). In determining the amount of the dividends they took into consideration the earnings of the corporation for the year involved, its prospects for the future, the available funds, the corporate needs, the history of financial failures and disappearance of independent shortline railroads and the necessity of maintaining confidence in the corporation. (Tr. 252, 254, 264–269, 653, 1137, 1361, 1515). Plaintiff's officers also determined that the stockholders were entitled to a return even though the corporate needs exceeded the available funds. (Tr. 264, 650–651, 1517–1518). In the development of these recommendations there was no discussion between Ben and Hugh Tarbutton of the tax burden on stockholders which would result from dividend dis-

tributions or of the desirability of avoiding taxes through withholding dividends and instead accumulating earnings. (Tr. 269, 1125, 1278, 1360–1361, 1515, 1520). There were no discussions to this effect by Ben and Hugh Tarbutton with other directors or shareholders either at the meetings or otherwise. (Tr. 1129).

125.

The distribution of the Plaintiff's entire net earnings as dividends during each of the taxable years would have resulted in additional income taxes on the stockholders in the following amounts (P. Ex. 1, Stip. Ex. L):

| Year | Additional Income Tax Liability of Stockholders if All Earnings Distributed |
|------|------|
| 1965 | $110,655.42 |
| 1966 | $134,716.96 |
| 1967 | $130,885.65 |
| 1968 | $168,362.33 |
| 1969 | $197,020.75 |
| Total | $741,641.11 |

126.

The corporate managers had portfolios of securities in their own names and served on the boards of other business corporations. (Tr. 62, 321–324, 1368–1369). It is evident that they were familiar with normal corporate policies and practices with respect to the payment of dividends and with the fact that upon the distribution of dividends the taxable income of the stockholders is increased. They were aware of the distinction between capital gains and ordinary income and of the fact that a "growth stock" pays relatively less in dividends and enjoys capital appreciation, subject to capital gains tax on sale, while "income stock" places greater emphasis upon current dividends. (Tr. 646–649, 1362, 1370).

127.

This is not a case in which the officers or stockholders have indirectly drawn

monies or received financial benefits from the corporation. The salaries of the two principal managers of the Plaintiff were at a level of $36,000 each for the years 1965 through 1968 and at $50,000 each for 1969, and there is no suggestion that this was unreasonable. (P. Ex. 1, Stip., Par. (9); Tr. 85). No corporate loans were made to stockholders and directors, and there is no evidence that corporate property was used for personal purposes. (Tr. 1262, 1381). To the contrary, properties of the individual shareholders were often used to support the corporation. Members of the Tarbutton family held a large inventory of land in the vicinity of the railroad for purposes of industrial development along the road. (Tr. 69, 382–386). It is customary for railroads to hold large inventories of land for development, but in this instance the land was held outside of the corporation and made available to customers of the railroad at no charge to the customer or the railroad, or at modest charges or low rentals. (Tr. 384–386). The Tarbutton brothers did not seek to profit individually from the sales of land by them to industrial concerns locating along Plaintiff's road, but held the land for the benefit of Plaintiff. (Tr. 385). In the history of the corporation the stockholders had loaned money to the corporation in emergencies, such as in 1957 for the track extension. (Tr. 1381–1383). The stockholders had no plans to sell their stock or have it redeemed by Plaintiff. (Tr. 547, 1262–1264).

### 128.

In the formulation of Plaintiff's corporate policy the dominant considerations were corporate needs. The policies were formulated by two young men determined to succeed in their new responsibility of managing the railroad and the avoidance of income taxes with respect to shareholders was not a purpose for Plaintiff's accumulation of earnings. In view of the needs of the corporation and its responsibility to customers who had plants on the line valued at more than $100,000,000, they would have considered a proposal to pay out all earnings in dividends as extremely unreasonable and grossly irresponsible, and they believe that they would have been derelict in their obligations to the corporation to have suggested such a policy. (Tr. 266, 656–657, 663, 1125–1126, 1361). Plaintiff's dividend policy was a reasonable one. (Tr. 867–869). Plaintiff was not availed of for the purpose of avoiding the income tax with respect to its shareholders.

### CONCLUSIONS OF LAW

#### 1.

The Court has jurisdiction of this action and of the parties hereto. All procedural requirements for bringing the action have been met, including the timely filing of the claims for refund on which Plaintiff relies with respect to each taxable year here involved.

#### 2.

Plaintiff's accumulations of earnings during each of the years 1965 through 1969 were reasonable in light of the reasonable and reasonably anticipated needs of its business.

#### 3.

None of Plaintiff's accumulations of earnings during the years 1965 through 1969 was for the purpose of avoiding individual income taxes with respect to its shareholders; therefore, Plaintiff is not a corporation subject to the accumulated earnings tax by section 532 of the Internal Revenue Code of 1954, as amended.

#### 4.

Defendant's assessment and collection of accumulated earnings taxes for Plaintiff's calendar years 1965 through 1969 were erroneous and illegal and, there-

fore, Plaintiff is entitled to a refund of all accumulated earnings taxes paid for those years, in the amount of $445,468.-22, plus costs and interest as is provided by law.

## DISCUSSION

The interesting history of the accumulated earnings tax, as well as its philosophy, is sketched in United States v. Donruss, Co., 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495 (1968). There it is shown that the tax originated in the Tariff Act of 1913 which imposed a tax on the shareholders of any corporation "formed or fraudulently availed of for the purpose of preventing the imposition of such tax [the normal income tax] through the medium of permitting such gains and profits to accumulate instead of being divided or distributed . . . ." § II (A)(2), 38 Stat. 166. The 1913 Act made accumulation beyond the reasonable needs of the business "prima facie evidence of a fraudulent purpose to escape such tax. . . ." 38 Stat. 167. To facilitate proof of tax avoidance purpose the Revenue Act of 1918, section 220, deleted the word "fraudulently". The Revenue Act of 1921, section 220, shifted the incidence of the tax from shareholders to corporation. To increase the productivity of the tax the Revenue Act of 1934, sections 102 and 351, subjected personal holding companies to a tax on undistributed income regardless of the purpose of that accumulation. In 1936, Congress faced the problem of undistributed corporate earnings and attempted the alternative method of imposing an undistributed profits surtax on most corporations. Revenue Act of 1936, section 14. The accumulated earnings tax was retained along with the requirement that "purpose" must be proved. Again, to increase productivity the Revenue Act of 1938, section 102, required the taxpayer, once an unreasonable accumulation was established, to prove the absence of purpose by a *clear* preponderance of the evidence. Only minor changes were made in this tax from 1938 to 1954. Then came changes which *Donruss* describes as "generally favorable to the taxpayer" (page 306, 89 S.Ct. page 506), adding that "Congress' reaction to the complaints was to emphasize the reasonable needs of the business as a proper purpose for corporate accumulations and to make it easier for the taxpayer to prove those needs.[12]

12. . . . Section 537 included anticipated needs as reasonable needs of the business. In addition to those changes, § 533(a) omitted the requirement that the taxpayer negate the existence of tax avoidance purpose by a 'clear preponderance of the evidence,' and substituted a 'preponderance' test. [Footnote in *Donruss*]

As the House Ways and Means Committee said, 'Your committee believes it is necessary to retain the penalty tax on unreasonable accumulations as a safeguard against tax avoidance. However, several amendments have been adopted to minimize the threat to corporations accumulating funds for legitimate business purposes . . . .' " Additional quotes from the House Ways and Means Committee are equally illuminating:

Your committee has received numerous complaints that this provision is prejudicial to small business, that it has been applied in an arbitrary manner in many cases, and that it is a constant threat to expanding business enterprises. Fear of the penalty tax is said to result frequently in distribution of funds needed by the corporation for expansion or other valid purposes.

\* \* \*

Reasonable needs of the business.—One of the principal reasons for confusion as to application of the section 102 tax has been the lack of adequate standards as to what constitutes the reasonable needs of the business. Some of the standards informally employed in the past, such as the distribution of 70 percent of earnings, have been erroneous or irrelevant. More often, in the absence of adequate

guidance, revenue agents in examining cases have applied their individual concepts as to business needs.

As a result some improper criteria developed which have led to criticism of the tax on unreasonable accumulations. One such principle is the so-called immediacy test, under which there must be an immediate need for the funds in order to justify the retention of earnings. In some cases section 102 was applied even though the corporation had definite plans for expansion and the bona fides of the expansion program were not in question.

In order to eliminate the immediacy test, your committee has expressly provided in the statute that the reasonable needs of the business shall include "reasonably anticipated" needs of the business. It is contemplated that this amendment will cover the case where the taxpayer has specific and definite plans for acquisition of buildings or equipment for use in the business. It would not apply where the future plans are vague and indefinite, or where execution of the plans is postponed indefinitely.

The criticism has also been made that, in determining the reasonable needs of the business, consideration has been frequently given to events occurring after the close of the taxable year. Your committee is of the opinion that only the facts as of the close of the taxable year should be taken into account in determining whether an accumulation is reasonable. If the retention of earnings is justified as of the close of the taxable year, subsequent events should not be used for the purpose of showing that the retention was unreasonable in such year. However, subsequent events may be considered to determine whether the corporation has actually consummated the plans for which the earnings were accumulated.

This case does not relate to normal income taxes nor to ordinary surtaxes. All such taxes due have been paid and no claims for refund thereof have been filed. The Government's contention here is that the Plaintiff permitted an unreasonable accumulation of earnings and profits and that it did so for the purpose of avoiding the income tax with respect to its shareholders. "The tax imposed by section 102 [now 531] is a penalty tax and as a penalty it should not be imposed lightly." F. E. Watkins Motor Co., 31 T.C. 288, 300 (1958). "Determination of the reasonable needs of its business is, in the first place, a task for the officers and directors of the corporation. . . . We should be hesitant to attribute a sinister or ulterior motive to the corporation unless such a factual situation clearly appears." Crawford County Printing & Publishing Co., 17 T.C. 1404, 1414 (1952). "The purpose of the section 531 surtax is to discourage individual taxpayers from abusing the corporate form for the purpose of decreasing their personal income tax liability, not to award the Commissioner an *ex post facto* veto over the decisions of the board of directors." Electric Regulator Corporation v. C. I. R., 336 F.2d 339, 346–347 (2d Cir. 1964). The officers and directors of Plaintiff with their intimate first-hand knowledge of its business and operations were in a far better position than any of the rest of us to appraise accurately its opportunities for continued growth, its obligations to its shippers, and its reasonable, and reasonably anticipated, needs. They made these appraisals, these determinations from day to day—from year-end to year-end. They correctly determined that the Plaintiff had the needs outlined in the foregoing findings of fact. The Plaintiff had the "intention that the need[s] would be met in a regular course of business. This, in our view, was enough." Sterling Distributors, Inc. v. United States, 313 F.2d 803, 807 (5th Cir. 1963).

With prime interest rates at an all time high and still rising Plaintiff seems wise in relying in large part upon internally generated funds for maintenance

and expansion of its business. With so many of the nation's railroads in financial distress due in part to too liberal dividend policies, a reasonable conservatism on the part of this shortline railroad would seem to be entirely in order. In my opinion, Plaintiff's dividend policy reflected an appropriate exercise of the managerial function and was entirely in keeping with the needs and interests of the corporation.

The dividend policy was formulated each year by Ben and Hugh Tarbutton. Each of them has testified at length on direct and cross-examination. The whole purport of their testimony is to the effect that tax avoidance was no part of their motivation. From having observed the witnesses personally, from having weighed their testimony carefully in light of all of the facts and circumstances surrounding this case, this court accepts their testimony as entirely credible, and, therefore, has found and concluded that tax avoidance played no part in the formulation or execution of Plaintiff's dividend policy.

Judgment in conformity with the foregoing Findings of Fact, Conclusions of Law, and Discussion will be entered when the amount has been computed by the parties.

## EXHIBIT A

### SANDERSVILLE RAILROAD COMPANY

\* \* \*

### CAPITAL ACQUISITIONS 1965–1970

| Asset | Date Acquired | Cost | Payment Made on Date of Acquisition | Amount Financed | Monthly Principal | Monthly Interest |
|---|---|---|---|---|---|---|
| 50 Aluminum Covered Hopper Cars | 1965 | $1,092,965 | $230,050 | $862,915 | $12,500 | 5.25% of outstanding principal balance |
| Company Car: Oldsmobile | 1965 | 3,624 | 3,624 | –0– | N/A | N/A |
| Rail Jacks | 1965 | 2,185 | 2,185 | –0– | N/A | N/A |
| 9,000 Shares Southern Railway Co. Preferred Stock | 1965 | 180,714 | 180,714 | –0– | N/A | N/A |
| Totals for 1965: | | $1,279,488 | $416,573 | $862,915 | $12,500 | N/A |
| 12.83 Acres Land | 1966 | $ 8,002 | $ 8,002 | –0– | N/A | N/A |
| 17.00 Acres Land | 1966 | 9,900 | 9,900 | –0– | N/A | N/A |
| Spur Track | 1966 | 3,300 | 3,300 | –0– | N/A | N/A |
| Southern Railway Co. Preferred Stock | 1966 | 139,519 | 139,519 | –0– | N/A | N/A |
| Southern Railway Co. Common Stock | 1966 | 41,897 | 41,897 | –0– | N/A | N/A |
| Totals for 1966: | | $202,618 | $202,618 | –0– | N/A | N/A |
| Ford Pick-up Truck | 1967 | $ 1,150 | $ 1,150 | –0– | N/A | N/A |
| Company Car: Chrysler | 1967 | 3,063 | 3,063 | –0– | N/A | N/A |
| Southern Railway Co. Preferred Stock | 1967 | 254,939 | 254,939 | –0– | N/A | N/A |
| Tie Renewer | 1967 | $ 6,421 | $ 6,421 | –0– | N/A | N/A |
| Yard Track | 1967 | 50,937 | 50,937 | –0– | N/A | N/A |
| Totals for 1967: | | $316,510 | $316,510 | –0– | N/A | N/A |

| Asset | Date Acquired | Cost | Payment Made on Date of Acquisition | Amount Financed | Monthly Principal | Monthly Interest |
|---|---|---|---|---|---|---|
| Diesel Locomotive [1] | 1968 | $157,825 | $ 27,356 | $130,469 | $2,000 | Floating prime rate on outstanding principal balance |
| Ford Truck | 1968 | 3,615 | 3,615 | –0– | N/A | N/A |
| Crossing Signs | 1968 | 916 | 916 | –0– | N/A | N/A |
| Southern Railway Co. Preferred Stock | 1968 | 99,450 | 99,450 | –0– | N/A | N/A |
| Radio Equipment | 1968 | 4,780 | 4,780 | –0– | N/A | N/A |
| Yard Track | 1968 | 8,681 | 8,681 | –0– | N/A | N/A |
| **Totals for 1968:** | | $275,267 | $144,798 | $130,469 | $2,000 | N/A |
| Company Car: Oldsmobile | 1969 | $4,310 | $4,310 | –0– | N/A | N/A |
| **Totals for 1969:** | | $4,310 | $4,310 | –0– | N/A | N/A |
| Caboose | 1970 | $ 1,509 | $ 1,509 | –0– | N/A | N/A |
| Diesel Locomotive W/Radio | 1970 | 171,948 | –0– | $171,948 | $ 3,000 | Floating prime rate on outstanding principal balance |
| Ford Truck— F60 CCH | 1970 | 5,304 | 5,304 | –0– | N/A | N/A |
| 50 Steel Covered Hopper Cars | 1970 | 922,038 | 472,038 | 450,000 | 7,500 | 1% above prime rate on outstanding principal balance |
| Signal Lights on Bells | 1970 | 9,454 | 9,454 | –0– | N/A | N/A |
| Roadway Tamper | 1970 | 55,542 | 55,542 | –0– | N/A | N/A |
| Yard Track No. 2 | 1970 | 10,532 | 10,532 | –0– | N/A | N/A |
| Yard Track No. 3 | 1970 | 13,802 | 13,802 | –0– | N/A | N/A |
| Yard Track No. 5 | 1970 | 4,788 | 4,788 | –0– | N/A | N/A |
| Tractor-Loader Backhoe | 1970 | 11,549 | 11,549 | –0– | N/A | N/A |
| Flashing Lights | 1970 | 9,979 | 9,979 | –0– | N/A | N/A |
| Excess Weight Rail—Main Line | 1970 | 12,496 | 12,496 | –0– | N/A | N/A |
| **Totals for 1970:** | | $1,228,941 | $606,993 | $621,948 | $10,500 | N/A |

## EXHIBIT H TO STIPULATION

### Exhibit A to Opinion

1. The parties agree to the cost figure indicated for this locomotive. They are in disagreement as to the amount financed and the amount of the payment made on the date of acquisition.

## EXHIBIT B

From: The Atlanta Constitution, September 14, 1972, page 20D

# State Asks U.S. Alumina Plant

The State of Georgia is proposing to the federal government that it build an experimental $20 million pilot plant in the state to make alumina from kaolin.

The plan is based on a study prepared by Georgia Tech that shows that kaolin is approaching the economic range of bauxite as a source of alumina.

Aluminum is normally produced by a two-stage process from bauxite. The first process produces a very pure form of aluminum oxide with the end product known as alumina. The second stage produces the metal aluminum from alumina.

The Georgia Department of Industry and Trade says that known kaolin reserves in the state now total 500 million tons. The U.S. is dependent on foreign sources of bauxite for the production of alumina.

Louis W. Truman, Georgia's Industry and Trade executive director, will hold a press conference Friday afternoon at 2:30 to announce his proposal for the pilot plant.

Truman will make the proposal as a plan to reduce the dependence on foreign sources and thus halt a part of the dollar outflow the dependence represents.

The study shows that the most economical process in use now costs about $54 to process a ton of alumina from kablin about $4 higher than the current bauxite process.

Industry and Trade says, however, that the kaolin process is relatively new and has not undergone the cost refinements that other processes have.

The Georgia Tech study showed that each 1,000-ton-per-day plant in Georgia would employ in excess of 250 persons directly which would require an additional 1,000 new indirect jobs in the community.

The study also shows that one quarter of the domestic demand for alumina could be met by Georgia sources by 1985-90. The study projected an additional state tax revenue of $8.4 million per year.

## EXHIBIT C

### THE MACON TELEGRAPH AND NEWS
### June 9, 1974

# Georgia Clay Now Checked For Metal

ATLANTA, Ga. (AP) —A group of American aluminum companies has joined the federal government in a project to learn if Georgia clay can be substituted for Jamaican bauxite as a source of aluminum.

The $1 million pilot project is being conducted by the U.S. Bureau of Mines at a site near the Hoover Dam in Nevada using Georgia clay, a low-grade source of alumina.

The Jamaican government has been pushing for higher prices for the island country's bauxite. The demands could push the price of ingots 2.5 to 4 cents a pound above the current price of 33 cents per pound, according to industry sources.

The alumina-bearing clay is found in the Georgia piedmont and in portions of North Carolina.

The Nevada project began May 31. If the technology developed there proves sound, it could mean new jobs in low-income rural Georgia counties.

One of the companies participating in the project, Anaconda, pioneered a process to extract alumina from Georgia clay several years ago by using hydrochloric acid.

A spokesman for Anaconda said the company is now deciding whether to begin construction on a plant without waiting for the results of the Nevada project.

"We think there's definitely a future in it," said Ralph Mecham. He added the company has purchased a clay-recovery site on the county line between Warren and Glascock counties, about 100 miles southeast of Atlanta.

(EXHIBIT D)

## SANDERSVILLE RAILROAD COMPANY

Comparative Balance Sheet
December 31

| | 1960 | 1961 | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | | | | |
| Cash | $ 25,325.59 | $ 16,446.23 | $ 38,398.56 | $ 163,272.16 | $ 480,266.11 | $ 152,177.95 | $ 253,072.37 | $ 162,372.31 | $ 295,795.22 | $ 590,101.38 |
| Traffic & Car Service Balances | 17,320.39 | 22,904.88 | 9,282.97 | 41,485.74 | 49,236 27 | 66,722.33 | 83,750.78 | 70,618.93 | 70,331 06 | 74,581.17 |
| Net Balance Due Agent | 125.87 | 78.24 | 104 26 | 885.69 | 1,302.67 | 775.29 | 1,479.33 | 6,403.60 | 9,869.60 | 11,587.86 |
| Miscellaneous Receivables | 10,022 51 | 6,613.51 | 3,904.45 | 713.50 | 1,633.85 | 1,811.26 | 731.64 | 731.67 | 1,346 43 | 2,454.18 |
| Working Fund Balances | -0- | 102 69 | 30.69 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Salary Advances | 135.00 | -0- | -0- | -0- | -0- | -0- | 1,011.20 | 1,064.71 | -0- | -0- |
| Materials & Supplies | -0- | -0- | -0- | -0- | -0- | 9,148.50 | -0- | -0- | -0- | 7,500.00 |
| Other | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 3,000.00 |
| Total Current Assets: | 52,929.36 | 46,145.55 | 51,720.93 | 207,357.09 | 533,438.90 | 231,635.33 | 341,045.32 | 242,191.22 | 378,342.31 | 690,224.59 |
| **Investments** | | | | | | | | | | |
| Stocks & Bonds | 530,650.30 | 553,495.76 | 587,280.81 | 576,957.55 | 472,339.33 | 593,380.72 | 727,619.97 | 982,558 87 | 1,082,005.64 | 1,126,476.94 |
| Notes—Manger Hotel Corp. | 132,992.46 | 125,382.99 | 117,463.55 | 109,312.56 | 100,643.67 | 91,741.08 | 82,425.06 | 72,755.43 | 62,691.85 | 52,218 28 |
| Other Deferred Debits | -0- | -0- | -0- | -0- | 2,713.82 | 67,639.83 | 354.94 | -0- | -0- | -0- |
| Total Investments: | 663,642.76 | 678,878 75 | 704,744.36 | 686,270.11 | 575,696.82 | 752,761.63 | 810,399 97 | 1,055,314.30 | 1,144,697.49 | 1,178,695.22 |
| **Road & Equipment** | | | | | | | | | | |
| Road—General | 108,197.88 | 109,010.49 | 104,760.70 | 108,260.70 | 108,260.70 | 113,411.80 | 134,688.00 | 161,209.41 | 206,415.05 | 205,415.05 |
| Equipment—Miscellaneous | 122,951.76 | 18,001.76 | 24,242.70 | 26,864.88 | 31,066.78 | 29,614.06 | 24,520.06 | 18,540.11 | 25,569.51 | 26,464.38 |
| Equipment—Covered Hopper Cars | | 331,186.55 | 331,186.55 | 331,186.55 | 331,186.55 | 1,420,736.55 | 1,420,736.55 | 1,420,736.55 | 1,420,736.55 | 1,424,151.20 |
| New Track to Kaolin Plant | 247,569.23 | 230,980.53 | 230,355.83 | 230,355.83 | 230,355 83 | 230,355.84 | 230,355.83 | 230,355.83 | 230,355 83 | 230,355.83 |
| Diesel Engines | -0- | 104,950.00 | 104,850 00 | 104,950.00 | 242,084.00 | 242,084.00 | 242,084.00 | 243,175.99 | 401,000.60 | 294,958.71 |
| Total: | 478,718.87 | 794,129 33 | 795,495.78 | 801,617.96 | 942,953.86 | 2,036,202.25 | 2,052,384.44 | 2,074,017.89 | 2,284,077.54 | 2,182,345.17 |
| Depreciation Reserve | 128,924.52 | 165,729.40 | 211,046.42 | 246,992.94 | 295,444.00 | 416,468.24 | 570,211.04 | 704,340.10 | 835,045.60 | 875,561.76 |
| Net Road & Equipment: | 349,794.35 | 629,399.93 | 584,449.36 | 554,625.02 | 647,509.86 | 1,619,734.01 | 1,482,173.40 | 1,369,677.79 | 1,449,031.94 | 1,306,783.41 |
| **TOTAL ASSETS** | $1,066,366.47 | $1,354,424.23 | $1,340,914.65 | $1,448,252.22 | $1,756,645.58 | $2,604,130.97 | $2,633,618.69 | $2,667,183.31 | $2,972,071.74 | $3,175,703 22 |

[EXHIBIT F TO STIPULATION]
Exhibit "D" to Opinion

SANDERSVILLE RAILROAD COMPANY

\* \* \*

Comparative Balance Sheet
December 31

| | 1960 | 1961 | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Current Liabilities** | | | | | | | | | | |
| Traffic & Car Service Payable | $ 3,807.94 | $ 7,445.38 | $ 3,525.70 | $ 1,500.00 | $ 3,200.00 | $ -0- | $ -0- | $ -0- | $ -0- | $ -0- |
| Audited Accounts & Wages Payable | 28,050.84 | 19,350.56 | 29,397.45 | 50,883.42 | 154,316.70 | 35,176.09 | 94,427.43 | 51,165.42 | 36,988.56 | 112,178.28 |
| Miscellaneous Payable | 26,126.95 | 26,554.36 | 25,172.22 | 4,269.10 | 4,419.70 | 4,688.92 | 5,446.21 | 3,505.91 | 4,206.84 | 12,988.74 |
| Federal Income Tax | 72,937.56 | 69,387.26 | 103,962.97 | 119,994.44 | 127,986.96 | 112,985.62 | 33,383.13 | 49,474.52 | 66,761.80 | 57,426.85 |
| Other Taxes Payable | 6,105.80 | 5,845.83 | 8,623.36 | 5,675.68 | 12,957.49 | 10,765.01 | 29,115.62 | 10,100.67 | 15,193.21 | 9,461.94 |
| Debt Due within One Year | -0- | 150,000.00 | 50,000.00 | -0- | -0- | 150,000.00 | 150,000.00 | 150,000.00 | 174,000.00 | 98,514.37 |
| Unmatured Dividend Declared | -0- | -0- | -0- | -0- | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 75,000.00 |
| Total Current Liabilities: | 137,029.09 | 278,583.39 | 220,681.70 | 182,322.64 | 362,880.85 | 373,615.64 | 372,372.39 | 324,246.52 | 357,150.41 | 365,570.18 |
| **Long-Term Debt** | | | | | | | | | | |
| Hopper Cars & Locomotive | -0- | 50,000.00 | -0- | -0- | -0- | 524,514.37 | 374,514.37 | 224,514.37 | 182,075.37 | 83,561.00 |
| **Other Liabilities & Deferred Credits** | | | | | | | | | | |
| Unrealized Profit | 105,944.99 | 99,883.10 | 93,574.29 | 87,008.42 | 80,175.08 | 73,063.31 | 65,661.79 | 57,958.75 | 49,941.85 | 41,598.39 |
| Other | .52 | 650.00 | 25.00 | -0- | -0- | -0- | -0- | -0- | 92.82 | -0- |
| Total: | 105,945.51 | 100,533.10 | 93,599.29 | 87,008.42 | 80,175.08 | 73,063.31 | 65,661.79 | 57,958.75 | 50,034.67 | 41,598.39 |
| **TOTAL LIABILITIES:** | $ 242,974.60 | $ 429,116.49 | $ 314,280.99 | $ 269,331.06 | $ 443,055.93 | $ 971,193.32 | $ 812,548.55 | $ 606,719.64 | $ 589,260.45 | $ 490,729.57 |
| Capital Stock [1] | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 |
| Insurance Reserve [2] | -0- | -0- | -0- | -0- | -0- | 250,000.00 | 250,000.00 | 250,000.00 | 250,000.00 | 250,000.00 |
| **Retained Earnings:** | | | | | | | | | | |
| Retained Earnings—Unappropriated | 711,713.29 | 803,391.87 | 905,304.94 | 1,006,633.66 | 1,158,921.16 | 813,589.65 | 882,937.65 | 1,071,070.14 | 1,310,463.67 | 1,632,811.29 |
| Net Profit from Income Account | 117,278.55 | 101,913.07 | 101,328.72 | 192,287.50 | 194,668.49 | 384,975.26 | 265,732.87 | 291,130.17 | 329,596.56 | 374,224.36 |
| Dividends Paid | (25,600.00) | -0- | -0- | (40,000.00) | (60,000.00) | (60,000.00) | (60,000.00) | (60,000.00) | (60,000.00) | (75,000.00) |
| Adjustments | -0- | -0- | -0- | -0- | -0- | ( 5,627.26) | (17,600.38) | 8,263.36 | 52,751.06 | 2,938.00 |
| Stock Dividends | -0- | -0- | -0- | -0- | (480,000.00) | -0- | -0- | -0- | -0- | -0- |
| Insurance Reserve | -0- | -0- | -0- | -0- | -0- | (250,000.00) | -0- | -0- | -0- | -0- |
| | 803,391.84 | 905,304.94 | 1,006,633.66 | 1,158,921.16 | 813,589.65 | 882,937.65 | 1,071,070.14 | 1,310,463.67 | 1,632,811.29 | 1,934,973.65 |
| **TOTAL LIABILITIES & NET WORTH:** | $1,066,366.44 | $1,354,421.43 | $1,340,914.65 | $1,448,252.22 | $1,756,645.58 | $2,604,130.97 | $2,633,618.69 | $2,667,183.31 | $2,972,071.74 | $3,175,703.22 |

1. A stock dividend declared in 1964 is reflected on this balance sheet as a transfer in 1964 of $480,000 from the Retained Earnings account to the Capital Stock account. Defendant contends that the amount of $480,000 is nevertheless to be included in accumulated earnings and profits for the years 1965 through 1969.

2. By action of the Board of Directors, an Insurance Reserve account was established in 1965 by the transfer of $250,000 from the Retained Earnings account to an Insurance Reserve account. Defendant contends that the amount of $250,000 is nevertheless to be included in accumulated earnings and profits for the years 1965 through 1969.